## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| KERRY JOHNSON, et al. | * | |
| Plaintiffs | * | |
| v. | * | Civil Action No. 1:06-cv408 |
| GEICO Casualty Company, et al. | * | |
| Defendants | * | **CLASS ACTION** |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>APPENDIX IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

OF COUNSEL:

George M. Church
Laura A. Cellucci
Miles & Stockbridge P.C.
10 Light Street
Baltimore, Maryland  21202
410-727-6464

June 30, 2006

/s/ Gary Alderson
Gary Alderson, Trial Bar No. 3895
Dawn L. Becker, Trial Bar No. 2975
Law Offices of Dawn L. Becker
Citizens Bank Center
919 Market Street
Suite 725
Wilmington, Delaware  19801
302-778-5784

*Attorneys for Defendants*

# APPENDIX

| **CASE CITATION** | **EXHIBIT** |
| --- | --- |
| *Albanese v. Allstate Ins. Co.*<br>1998 WL 437370 (Del. Super. Ct. July 7, 1998) | A |
| *Flowers v. State Farm Mut. Auto. Ins. Co.*<br>2001 WL 1555332 (Del. Com. Pl. July 21, 2001) | B |
| *Fresh v. State Farm Mut. Auto. Ins. Co.*<br>1990 WL 964525 (Del. Com. Pl. June 29, 1990) | C |
| *Gloria v. Allstate County Mut. Ins. Co.*<br>No. SA-99-CA-676-PM (W.D. Tex. Sept. 29, 2000) | D |
| *Guy v. Sils*<br>1998 WL 409346 (Del. Ch. July 10, 1998) | E |
| *Kinnard v. Allstate Ins. Co.*<br>No. 992-00812 (Mo. Cir. Ct. Nov. 15, 1999) | F |
| *Liberty Mut. Fire Ins. Co. v. Amundson*<br>2001 WL 755375 (Del. Super. Ct. June 27, 2001) | G |
| *O'Malley v. Boris*<br>2001 WL 50204 (Del. Ch. Jan. 11, 2001) | H |
| *Watson v. Metropolitan Prop. & Cas. Ins. Co.*<br>2003 WL 22290906 (Del. Super. Ct. September 12, 2003) | I |
| *Melissa Murphy, et al. v. United Services Auto Assn., et al.*<br>No. 04C-07-003 RFS (Del. Super. Ct. May 10, 2005) | J |

# EXHIBIT   A

Westlaw.

Not Reported in A.2d
1998 WL 437370 (Del.Super.)
(Cite as: 1998 WL 437370 (Del.Super.))

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

Alexander ALBANESE
v.
ALLSTATE INSURANCE COMPANY

No. 97C-08-191-WTQ.

July 7, 1998.

Letter Opinion and Order on Defendant's Motion for Partial Summary Judgment-- Motion Granted.

James A. Erisman, Esquire, Daley Erisman & vanOgtrop, Wilmington.

Arthur D. Kuhl, Esquire, Dennis D. Ferri, P.A., Wilmington.

QUILLEN, J.

*1 Gentlemen:

This is the Court's opinion on Defendant Allstate Insurance Company's Motion for Partial Summary Judgment. The Motion requests dismissal of Count II of Plaintiff Alexander Albanese's Complaint. Count II alleges bad faith on the part of the Defendant in its denial of personal injury protection ("PIP") benefits under Delaware's no-fault law. For the following reasons, Defendant's Motion for Partial Summary Judgment is GRANTED.

FACTS

This action arises out of a November 25, 1995 motor vehicle accident ("the accident") during which Plaintiff sustained injuries. At the time of the accident, Plaintiff was insured under an automobile insurance policy issued by the Defendant that provided for reasonable and necessary medical expenses incurred by the Plaintiff as a result of the accident. Plaintiff alleged that he sustained bilateral carpal tunnel syndrome as a result of the accident. He obtained surgery for carpal tunnel syndrome and submitted his medical bills to the Defendant for payment on December 5, 1996 and January 27, 1997. Because Plaintiff's surgery had already been performed, Dr. Daniel Gross conducted a review of Plaintiff's medical records on behalf of the Defendant. Dr. Gross did not see or talk to the Plaintiff. Dr. Gross agreed that Plaintiff had carpal tunnel syndrome, but opined on April 17, 1997 that the carpal tunnel syndrome was not related to the accident. As a result, Defendant denied payment of Plaintiff's surgery expenses. Plaintiff filed suit on August 20, 1997 seeking PIP benefits for his medical expenses and alleged "bad faith" by Defendant for failure to reimburse him for the cost of his surgery. Defendant moved for partial summary judgment on February 27, 1998 seeking a dismissal of the bad faith allegations in Count II of Plaintiff's Complaint.

STANDARD ON SUMMARY JUDGMENT

When considering a Motion for Summary Judgment under Superior Court Civil Rule 56, the Court's function is to examine the record to determine whether genuine issues of material fact exist. *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.,* Del.Super., 312 A.2d 322, 325 (1973). If after reviewing the record in a light most favorable to the non-moving party the Court finds there are no genuine issues of material fact, summary judgment is appropriate. *Id.* The Court's decision must be based only on the record presented, including all pleadings, affidavits, depositions, admissions, and answers to interrogatories, and not on what evidence is "potentially possible." *Rochester v. Katalan,*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1998 WL 437370 (Del.Super.)
(Cite as: 1998 WL 437370 (Del.Super.))

Page 2

Del.Supr., 320 A.2d 704 (1974). All reasonable inferences must be drawn in favor of the non-moving party. *Sweetman v. Strescon Indust.,* Del.Super., 389 A.2d 1319 (1978). Summary Judgment will not be granted if the record indicates that a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of the law to the circumstances. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467 (1962).

## DISCUSSION

*\*2* The issue before the Court is whether Defendant's denial of PIP benefits to Plaintiff for carpal tunnel surgery could constitute bad faith. "[I]n order to establish 'bad faith' the plaintiff must show that the insurer's refusal to honor [the claim] was clearly without any reasonable justification." *Casson v. Nationwide Ins. Co.,* Del.Super., 455 A.2d 361, 369 (1982); *Tackett v. State Farm Fire & Cas. Ins.,* Del.Supr., 653 A.2d 254, 264 (1996). The question to be asked is "whether at the time the insurer denied liability, there existed a set of facts or circumstances known to the insurer which created a *bona fide* dispute and therefore a meritorious defense to the insurer's liability." *Casson,* 455 A.2d at 369. "[T]he question of bad faith refusal to pay should be submitted to the jury unless it appears that the insurer did not have reasonable grounds for relying upon its defense to liability." *Id.*

In the case at bar, Defendant says Plaintiff was not examined by Defendant's doctor because his surgery for carpal tunnel syndrome had already occurred. Instead, Defendant submitted Plaintiff's medical records to Dr. Gross for a peer review. Dr. Gross examined some of Plaintiff's 1985 through 1995 medical records to determine if the carpal tunnel syndrome surgery was related to the accident. The medical records reviewed were specifically listed in Dr. Gross' report of April 17, 1997. His review of the records presented to the Defendant failed to find any documented evidence of complaints or treatment compatible with carpal tunnel syndrome until at least five months following the accident. Further, Dr. Gross determined that this time interval between the injury and treatment is not usual and customary for the diagnosis of carpal tunnel syndrome. *See* Dkt. No. 14, Ex. A.

At oral argument, counsel for Plaintiff made an argument not emphasized in his brief. Plaintiff alleged that Dr. Gross' conclusion regarding the causation of Plaintiff's carpal tunnel injury to the accident was totally inconsistent with the records relied upon in Dr. Gross' peer review. [FN1] Plaintiff in his supplement to the record argues that Plaintiff's medical record document complaints concerning his hands, indicating that he suffered symptoms of carpal tunnel syndrome immediately after the accident. Plaintiff submitted the medical report of Dr. Wesley Young dated December 18, 1995. In this report, Dr. Young indicates that Plaintiff's "wrists hurt--had carp[a]l tunnel in past but not as bad as now." While this record shows that there was documentation of complaints by Plaintiff involving his hands a month after the accident, this particular report was not included in the records relied upon by Dr. Gross in his peer review. *See* Dkt. No. 19, Ex. C. Moreover, there is no allegation by Plaintiff that the record was submitted to Defendant.

> FN1. Since this argument was raised for the first time at oral presentation of the Motion, the Court allowed Plaintiff to supplement the record. The Court wanted to make certain that the conclusion reached by Dr. Gross was within the bounds of reason in light of the medical records upon which he relied. The Court is concerned with the possibility of insurance companies having medical doctors on retainer to issue reports favoring the insurance company without medical examinations.

Plaintiff also relies on medical records listed as 5 and 8 of Dr. Gross' peer review to bolster his argument that there existed documented complaints concerning his hands shortly after the accident. Record 5, as listed in Dr. Gross' peer review, states" "Admission, Medical Center of Delaware, October 1996, for release of right carpal tunnel with symptoms of one year (Dr. Sowa)." Record 8 of Dr. Gross' peer review states: "Records of Dr. Sowa of May 1996 and June 1996, indicate a six month history of symptoms of carpal tunnel syndrome with a positive bilateral EMG and positive Tinel's signs." Dkt. No. 14, Ex. A. These records at best suggest

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1998 WL 437370 (Del.Super.)
(Cite as: 1998 WL 437370 (Del.Super.))

that in May, June, and October of 1996, Dr. Sowa opined that Plaintiff had experienced symptoms of carpal tunnel syndrome from the time of the accident. Dr. Sowa first treated Plaintiff three months after the accident, on February 20, 1996, and there was no documented record of any hand injuries. It is not until May 1996, five months after the accident, that Dr. Sowa made his determination that Plaintiff suffered from carpal tunnel syndrome. According to Dr. Gross, five months is too long an interval from the time of the accident to causally connect Dr. Sowa's diagnosis of Plaintiff's carpal tunnel syndrome to the accident. Obviously, the opinions of Dr. Sowa and Dr. Gross might have been better coordinated, but it certainly cannot be said that the insurer "was clearly without any reasonable justification."

*3 The other reports relied on by Plaintiff merely list the opinions of various experts, none of which Dr. Gross examined in his peer review, stating that Plaintiff developed carpal tunnel syndrome from the accident. [FN2] While diametrically opposed to the findings of Plaintiff's experts, Dr. Gross' conclusion presented a *bona fide* dispute as to whether Plaintiff's need for carpal tunnel surgery was related to the accident. The record presented in this matter does not support Plaintiff's allegation that Defendant had no reasonable justification in denying payment of PIP benefits in 1997 and thus there was no basis for a bad faith claim against Defendant. Plaintiff's claim of bad faith should not go to a jury. *See Casson,* 455 A.2d at 369. The underlying issue of Defendant's obligation to pay for Plaintiff's carpal tunnel surgery expenses remains to be resolved. It seems to the Court that it would certainly be appropriate for the Defendant to review the current record to determine whether the treatment is compensable.

> FN2. The medical records of Dr. Wesley Young dated August 23, 1996 state in pertinent part: "main complaints revolve around [Plaintiff's] wrists--They hurt from the accident and now has been diagnosed as carp[a]l tunnel. Needs to get them fixed." *See* Dkt. No. 22, Ex. D. The narrative report of Dr. David T. Sowa dated August 7, 1997 states in pertinent part: "it is my opinion, within reasonable

medical probability, that the patient developed bilateral carpal tunnel symptoms after his November 25, 1995 motor vehicle accident. He reports having gripped the steering wheel at the time of impact." *Id.* at Ex. E. The narrative report of Dr. David T. Sowa dated November 12, 1997 states in pertinent part: "The next hand written note I have from Dr. Young, dated 11/29/95, indicated that Mr. Albanese was involved in a motor vehicle accident on 11/25/96. As a result of that accident he developed bilateral hand pain. When Dr. Young next saw Mr. Albanese on 12/18/95 the patient, again, complained that his wrists hurt.... Based on the history obtained from the patient and based on the medical records I have in my possession, I do not believe that Mr. Albanese would have come to surgery but for the 11/25/95 motor vehicle accident." *Id.* at Ex. F.

Accordingly, Defendant's Motion for Partial Summary Judgment is GRANTED. IT IS SO ORDERED.

1998 WL 437370 (Del.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

Westlaw.

Not Reported in A.2d
2001 WL 1555332 (Del.Com.Pl.)
(Cite as: 2001 WL 1555332 (Del.Com.Pl.))

Page 1

Only the Westlaw citation is currently available.

Court of Common Pleas of Delaware.

Ann FLOWERS, Plaintiff,
v.
STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, Defendant.

No. CR.A.1999-10-118.

Submitted June 11, 2001.
Decided July 2, 2001.

Robert C. McDonald, Esquire, Silverman & McDonald, Wilmington, DE, for plaintiff.

Diane M. Willette, Esquire, Casarino, Christman & Shalk, Wilmington, DE, for defendant.

DECISION AFTER TRIAL

JAY PAUL JAMES, Associate Judge.

*1 Plaintiff Ann Flowers ("Flowers") brings this action against her automobile insurance carrier, State Farm Automobile Insurance Company ("State Farm"), to recover for health care expenditures that have been denied coverage by State Farm. Flowers argues that State Farm wrongfully denied coverage for various treatments of injuries resulting from an automobile accident. State Farm claims that the bills are not reasonable and necessary treatment for the injuries received. A trial was held on these matters on June 11, 2001, and the Court reserved decision. This is the Court's decision after trial.

The Court received into evidence the testimony of Dr. Stephen Rogers and Flowers for the Plaintiff. The Court also received into evidence Plaintiff's Exhibit "1" which are disability slips written for Flowers by Dr. Kristina Hollstein. The Court received two exhibits into evidence from State

Farm: Defendant's Exhibit "1" is the examination reports of Dr. Donald Archer, and Defendant's Exhibit "2" is Flowers' treatment records with Dr. Hollstein.

The claim of Flowers is for $3,419.74 in unpaid bills for Dr. Hollstein, $210.00 unpaid for Dr. Tony Cucuzzella, and a $20.00 copay for Dr. Fisher. Additionally, Flowers is claiming disability payments for the time she was out of work. The PIP rate agreed upon by the parties is $132.06 per week. The amount due under PIP for the period from the accident up to December 17, 1998 is not in dispute. Flowers' claim for PIP monies relates to the period from December 19, 1998 through August 14, 2000.

The relevant facts as found by the Court are as follows. Flowers was involved in an automobile accident August 14, 1998. Her car was impacted on the rear passenger side. Flowers was not wearing her seatbelt, and was taken to Christiana Hospital by ambulance. She was evaluated and released from the hospital after she received x-rays and pain medications. On August 20, 1998, she went to see Dr. Hollstein complaining of headaches, neck pain, mid and low back pain, pain in both legs and arms, numbness is both legs and arms, and rib and chest pain.

Dr. Hollstein put Flowers on a schedule of chiropractic care immediately following the accident. Flowers stated that chiropractic treatment relieved the pain for a short period of time, but the pain usually returned within 24 hours. Flowers continued this care even after Dr. Archer's medical evaluation suggested that chiropractic care was not needed. It is the bills resulting from that care by Dr. Hollstein that are the majority of the dispute between the parties.

Flowers was also under the care of Dr. Cucuzzella from June 14, 1999 until March 1, 2000. Dr. Cucuzzella diagnosed Flowers as having bilateral sacro-iliac joint arthropathy, and he treated it through injections and an epidural spinal injection. Flowers reported mixed results from these

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 1555332 (Del.Com.Pl.)
(Cite as: 2001 WL 1555332 (Del.Com.Pl.))

treatments. The injections diminished her pain but the epidural was not very effective. Dr. Cucuzzella also ordered Flowers to have an MRI and a bone scan, the results of which were both normal.

*2 Flowers also saw Dr. Fisher, who upon examination on or about July 14, 2000, diagnosed her pain as not a result of a spinal problem.

Dr. Archer did an independent medical review of Flowers and her treatment records, and saw her on November 28, 1998. Dr. Archer's medical review led him to the belief that the continuing back and neck pain of Flowers were a result of psychosocial factors, and that treatment from Dr. Hollstein was no longer necessary or helpful. Dr. Archer also examined Flowers on April 4, 2000, and agreed with his earlier diagnosis.

Dr. Stephen Rogers, who did a records review for Flowers, never performed a physical examination of Flowers, and did not have the complete record of treatment of Flowers from Dr. Hollstein.

It should be noted that Flowers was in a previous accident while working at Wawa in 1992, when she fell from a ladder and injured her tailbone and lower back. The symptoms found in the lower back were not resolved when she was involved in the accident of August 14, 1998. Flowers was seeing Dr. Hollstein approximately once every three weeks before the auto accident. After the latter accident, she saw Dr. Hollstein more frequently. Immediately following the second accident she saw Dr. Hollstein about four times a week, and worked her way back to one treatment every three weeks.

The question to the Court is whether her continued treatments with Dr. Hollstein were reasonable and necessary medical treatment as a result of the August 14, 1998 automobile accident.

Flowers was insured under the provisions of 21 *Del. C.* § 2118. Section 2118(a)(2) provides "Compensation to injured persons for reasonable and necessary expenses incurred within 2 years from the date of the accident." This includes medical, hospital, dental, surgical, medicine, x-ray, ambulance, and other services, as well as the net amount of lost earnings." 21 *Del. C.* § 2118(a)(2)(a) (1-3).

In a case such as this, "the Plaintiff has the burden of demonstrating the reasonableness and necessity of the medical treatment provided." *Lundberg v. State Farm Mutual Auto Ins. Co.,* Del.Com.Pl., C.A. No.1993-04-227, Smalls, C.J., 1994 WL 1547774 (July 11, 1994). "The terminology of reasonable and necessary, as used in the statute must be construed to mean coverage of these payments required for medical treatment." *Id.* at 2. It follows that the determination of required treatment must be based on a reasonable medical assessment. *Id.* The Court must also consider the "principle that the policy of [21 *Del. C.* § 2118] is to be liberally construed to achieve the public policy of universal coverage." *Id.* (citing *Morgan v. State Farm Mutual Auto Ins. Co.,* Del.Supr., 402 A.2d 1211 (1979)).

Dr. Rogers testified as a medical expert for Flowers, and he testified that the ongoing treatment Flowers received from Dr. Hollstein were reasonable, and disagreed with Dr. Archer's report. However, Dr. Rogers did not have Flowers' complete medical record at his disposal. Though he was aware of Flowers' previous injury to her lower back in 1992, he never saw Flowers' treatment records from Dr. Hollstein for the period of her treatment covering 1992–1998 prior to the auto accident. Dr. Rogers found all of Flowers' claimed unpaid medical bills and lost wages to be reasonable and necessary. Dr. Rogers admitted on cross that Dr. Fisher had diagnosed Flowers' problems as not spinal in nature.

*3 In response to Dr. Rogers expert testimony, State Farm submitted Dr. Archer's report (see Defendant's Exhibit "1"). Dr. Archer had the occasion to meet with and examine Flowers on two occasions, and had her complete treatment records from Dr. Hollstein to review. Dr. Archer recommended subsequent to seeing Flowers on November 28, 1998 that she was able to return to normal life. He did not feel any further treatment from Dr. Hollstein was necessary based on the records and his physical exams. He suggested that Flowers might require counseling to encourage a return to normal activities.

Based on the evidence in the record, the Court fails to find that Flowers proved by a preponderance of the evidence that her continuing injuries were

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 1555332 (Del.Com.Pl.)
(Cite as: 2001 WL 1555332 (Del.Com.Pl.))

Page 3

related to the August 14, 1998 automobile accident. Dr. Rogers records examination did not include the full record or any physical exams of Flowers, and Dr. Archer's report was based upon the completed record and physical exams of Flowers. Therefore, the claim of Flowers for the unpaid bills of Dr. Hollstein is denied; however, the $210 medical expense of Dr. Cucuzzella and $20 copay expense of Dr. Fisher shall be paid by State Farm.

Accordingly, judgment is hereby entered in favor of Flowers in the amount of $230. The balance of her claim that is in dispute is denied.

IT IS SO ORDERED.

2001 WL 1555332 (Del.Com.Pl.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# E X H I B I T   C

Westlaw.

Not Reported in A.2d
1990 WL 964525 (Del.Com.Pl.)
(Cite as: 1990 WL 964525 (Del.Com.Pl.))

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Common Pleas of Delaware, New Castle
County.

Brian L. FRESH, Plaintiff

v.

STATE Farm Mutual Automobile Insurance
Company, Defendant.

C.A. No. 1989-01-186

Submitted: June 11, 1990
Decided: June 29, 1990

Elwyn Evans, Jr., Evans & Evans, for the Plaintiff

Colin M. Shalk, Casarino, Christman & Shalk, for
the Defendant.

Arthur F. DiSabatino, Judge

OPINION AFTER TRIAL

*1 Plaintiff has brought this action against the
defendant insurer to recover benefits allegedly due
under the personal injury protection (PIP)
provisions of his automobile insurance policy. For
the reasons expressed herein, the plaintiff is not
entitled to a recovery.

Plaintiff was injured in an automobile accident on
January 25, 1987. Two days later he began
chiropractic treatment with Dr. James McCready.
State Farm paid for all chiropractic expenses
through May of 1987, by which time the cost of
chiropractic treatment was $4,682.00. Thereafter,
the plaintiff was examined by Dr. James Fusco on

June 8, 1987. Dr. Fusco reported to State Farm as
follows:
"It is my opinion that this patient apparently had
sustained injuries in the 1-25-87 motor vehicle
accident. He has made very significant
improvement to the point that he has stated he has
been pain free approximately one week prior to
this examination. He had no complaints to offer
on the date of this examination and my
examination was completely normal. The
straightened upper cervical curve which was
originally noted on the hospital x-ray was not
apparent on subsequent films.
Mr. Fresh's injuries are directly related to the
1-25-87 motor vehicle accident. He is not
currently disabled and has stated that he has been
performing his occupation without difficulties.
The treatment provided was reasonable and
necessary and apparently successful. In view of
the lack of any complaints on the part of the
patient and any positive findings I feel that
treatment is no longer necessary. I do not foresee
any permanency at this time."

Although State Farm advised the plaintiff that it
would not pay for further chiropractic services, the
plaintiff continued to see Dr. McCready. This
action was brought to recover for the chiropractic
services rendered to the plaintiff by Dr. McCready
from June 1, 1987 through January 25, 1989.

Under the personal injury protection coverage
required by 21 Del.C.§2118, the insured is entitled
to recover for reasonable and necessary medical
expenses incurred within two years from the date of
the accident. State Farm contends that chiropractic
services rendered after May 30, 1987 were not
reasonable and necessary.

State Farm had the plaintiff re-examined by Dr.
Fusco on February 28, 1988, following which Dr.
Fusco opined:
"After having reviewed the paper work
accompanying this patient and having examined
this patient on two occasions, it is my opinion that
Brian Fresh has had all reasonable opportunity to

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1990 WL 964525 (Del.Com.Pl.)
(Cite as: 1990 WL 964525 (Del.Com.Pl.))

achieve the optimum benefits available and to have made the maximum medical improvement with chiropractic care for the injuries he sustained in the 1-25-87 motor vehicle accident."

State Farm also sent the plaintiff's records to Dr. Melvin Rose, a chiropractic consultant in Peoria, Illinois. Dr. Rose testified that chiropractic services after May 30, 1987 were not reasonable and necessary.

*2 The opinions of Drs. Fusco and Rose contradict the testimony of the plaintiff and Dr. McCready. The plaintiff and Dr. McCready testified that the plaintiff continued to have headaches and muscle spasms of the cervical spine after May 30, 1987, which were relieved by chiropractic manipulation.

In this bench trial it is the function of the Court to act as fact finder and to resolve the obvious factual conflict as to whether chiropractic services provided after May 30, 1987 were reasonable and necessary. While I did not have the opportunity to hear live testimony from either Dr. Fusco or Dr. Rose, I nevertheless find their opinions on the question to be more credible than those of the plaintiff and Dr. McCready. I find that chiropractic services rendered after May 30, 1987 were not reasonable and necessary. Thus, State Farm properly denied PIP coverage to the plaintiff.

The Clerk is directed to enter judgment for the defendant.

1990 WL 964525 (Del.Com.Pl.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# E X H I B I T    D

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

**FILED**

SEP 2 9 2000

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY CLERK

| | | |
|---|---|---|
| PETER GLORIA and DAVID PEREZ, | § | |
| Plaintiffs, | § | |
| vs. | § | |
| | § | CIVIL ACTION NO. SA-99-CA-676-PM |
| ALLSTATE COUNTY MUTUAL | § | |
| INSURANCE COMPANY and | § | |
| ALLSTATE PROPERTY AND | § | |
| CASUALTY COMPANY, | § | |
| Defendants. | § | |

## ORDER

Pursuant to the consent of the parties in the above-styled and numbered cause of action to trial by the undersigned United States Magistrate Judge and consistent with the authority vested in the United States Magistrate Judges under the provisions of 28 U.S.C. § 636(c)(1) and Appendix C, Rule 1(T) of the Local Rules for the Assignment of Duties to United States Magistrates, in the Western District of Texas, the following order is entered.

### I. JURISDICTION

The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.

### II. PROCEDURAL HISTORY

Plaintiffs Peter Gloria and David Perez commenced this class action in the 57th District Court of Bexar County, Texas against defendant Allstate County Mutual Insurance Company on June 4, 1999, alleging violations under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, et seq., the Texas Insurance Code art. 21.21, and the Texas

1

64

Deceptive Practices Act ("DTPA") as well as breach of contract and fraud.[1] Because of the RICO claim, defendant removed the case to the District Court on June 25, 1999.[2] Defendant subsequently moved to dismiss the case because plaintiffs lacked standing.[3] Alternatively, defendant moved to transfer the case, under the first-to-file doctrine, to the Circuit Court of Cook County, Illinois, County Department, Chancery Division, where two substantially similar consolidated cases had previously been filed, or to stay the proceeding pending the outcome of a motion for nationwide class certification in the Illinois cases.[4] The parties then filed and the District Court granted a joint motion to stay proceedings until the Illinois cases were resolved.[5] On March 16, 2000, the District Court denied as moot defendant's motion to dismiss or in the alternative to transfer or stay.[6] Upon notice that the proceedings in Illinois had been resolved,[7] the District Court on April 13, 2000, ordered the stay lifted.[8] Defendant then moved for reconsideration of its motion to dismiss and the District Court Clerk received defendant's motion

---

[1] Docket no. 1, attachment (Original Complaint).

[2] Docket no. 1.

[3] Docket no. 2.

[4] Id.

[5] Docket nos. 4 and 6.

[6] Docket no. 7.

[7] See docket no. 10, exhibit 1. On March 21, 2000, the Illinois state court denied the motion for nationwide class certification in the consolidated cases, certifying instead only an Illinois class of Allstate insureds alleging essentially the same complaints as are at issue in this case.

[8] Docket no. 9.

2

to dismiss and/or strike the class allegations.[9] Plaintiffs responded to these motions and defendant replied.[10]

On May 8, 2000, plaintiffs filed their motion to certify a class action and the District Court Clerk received plaintiffs' first amended complaint which added factual allegations in support of their claims and which abandoned the fraud claim.[11] On May 16, 2000, defendant moved to stay the class certification proceedings pending a ruling on the motions to dismiss.[12] The parties stipulated that defendant's motions to dismiss the original complaint would apply to the first amended complaint.[13]

Plaintiffs' second amended complaint was filed on July 7, 2000,[14] and proceedings on defendant's pending motions to dismiss the original and first amended complaints were ordered stayed pending the filing of a motion to dismiss plaintiffs' second amended complaint.[15] The second amended complaint added defendant Allstate Property and Casualty Company[16] and

---

[9] Docket nos. 10 and 13, attachment. Defendant's motion to dismiss or to strike the class action was ordered filed on September 9, 2000.

[10] Docket nos. 14, 15, and 19.

[11] Docket nos. 16 and 15, attachment, respectively. Plaintiffs' first amended complaint was ordered filed on September 5, 2000.

[12] Docket no. 20.

[13] Docket no. 24.

[14] Docket no. 29.

[15] Docket no. 28.

[16] The defendants will be referred to collectively as "Allstate."

3

antitrust claims pursuant to 15 U.S.C. §§ 1 and 13.[17] On August 2, 2000, Allstate moved to dismiss the second amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(1)[18] and 12(b)(6)[19] and to strike or dismiss the class action allegations pursuant to 12(f).[20] Plaintiffs have responded to these motions[21] and Allstate has replied.[22] On September 5, 2000, the Court entered an order which provided that further consideration of plaintiffs' motion to certify a class would not be undertaken until after resolution of the pending motions to dismiss.[23] On September 12, 2000, the parties filed a stipulation stating that Allstate's motions to dismiss the second amended complaint filed on August 2, 2000, are the motions the Court should address and that all motions to dismiss filed prior to August 2 should be considered moot.[24] The stipulation further provides that the, "Parties agree the Sherman antitrust violations alleged are limited to violations of Section 1" and "that the Robinson-Patman Act does not apply."[25]

---

[17] Docket no. 29.

[18] Docket no. 34.

[19] Docket no. 32.

[20] Docket no. 36.

[21] These responses and one joint appendix originally were tendered to the Court with a joint motion to seal. On September 22, 2000, the Court entered an order, docket no. 54, which sealed portions of the responses and appendix and required plaintiffs to file redacted copied for the public record "within seven (7) calendar days" of the date of the Order. The Court has reviewed the unredacted copies -- tendered in the sealed record -- in preparing this Order.

[22] Docket nos. 61, 62, 63.

[23] Docket no. 43.

[24] Docket no. 50.

[25] Id. The Sherman antitrust violation alleged is pursuant to 15 U.S.C. § 1. The abandoned claim was an alleged violation of 15 U.S.C. § 13.

In sum, the pleadings for the Court's consideration are plaintiffs' second amended complaint,[26] Allstate's motions to dismiss pursuant to Rules 12(b)(1), 12(b)(6), and 12(f),[27] and plaintiffs' responses.[28] The claims remaining at issue are those alleging violations of RICO; the Sherman antitrust Act, 15 U.S.C. §1; the Texas Insurance Code art. 21.21; and the DTPA; as well as the claim for breach of contract.

## III. FACTUAL BACKGROUND

As will be discussed more completely in Section V, when considering motions to dismiss pursuant to FED. R. CIV. P. 12(b)(1) and (6), the Court is required to construe plaintiffs' factual allegations as true. Rule 12(b)(1) and (6) motions admit all well-pleaded facts in the complaint which it challenges.[29] Thus, in the spirit of Rules 12(b)(1) and (6), the Court sets forth the following narration of facts which are taken as true or admitted. The policy at issue provides:

Plaintiffs allege that at times during 1997 and 1998, they were provided personal injury protection ("PIP") and medical payments ("Medpay") coverage under their Texas personal automobile insurance policies issued by Allstate.[30] Allegedly, the PIP and Medpay coverage entitled plaintiffs to payment of the full amount of their medical expenses.[31] However, plaintiffs

---

[26] Docket no. 29.

[27] Docket nos. 34, 32, and 36, respectively.

[28] See note 21 above.

[29] Crowe v. Henry, 43 F.3d 198, 203 (5th Cir. 1995); Warfield v. Fidelity & Deposit Co., 904 F.2d 322, 326 (5th Cir. 1990).

[30] Docket no. 29 at 2.

[31] Id.

5

also allege that the PIP and Medpay provisions provide that the insureds would be paid their "reasonable expenses" incurred for "necessary medical treatment."[31] The policies at issue provide in relevant part that:

## PART B1-MEDICAL PAYMENTS COVERAGE

### INSURING AGREEMENT

A.   We will pay reasonable expenses incurred for necessary medical and funeral services because of bodily injury:

1.   Caused by accident and
2.   Sustained by a covered person.

## PART B2-PERSONAL INJURY PROTECTION COVERAGE

### INSURING AGREEMENT

A.   We will pay Personal Injury Protection benefits because of bodily injury:

1.   resulting from a motor vehicle accident and
2.   sustained by a covered person.

Our payment will only be for losses or expenses incurred within three years from the date of the accident.

B.   Personal Injury Protection benefits consist of:

1.   Reasonable expenses incurred for necessary medical and funeral services.[33]

---

[31]  Id.

[33]  Docket no. 29, exhibit, Texas Personal Auto Policy at 314, 316. The Court notes that unless rejected by the insured, the PIP coverage set forth above is required by the Texas Insurance Code which provides:

"Personal injury protection" consists of provisions of a motor vehicle liability policy which provide for payment to the named insured in the motor vehicle liability policy and members of the insured's household, any authorized operator or passenger of the named insured's motor vehicle including a guest occupant, up to an amount of $2,500 for each such person for payment of all reasonable

6

The policy also provides that for each of these coverages the "liability shown in the Declarations for this coverage is our maximum limit of liability."[34]

Plaintiffs allege that at various times during 1997 and 1998, they have submitted medical expenses to Allstate for payment under their PIP coverage.[35] According to plaintiffs' allegations, Allstate wrongfully reduced the medical bills to an amount lower than 100% of the expenses actually charged.[36] Allegedly, Allstate accomplished this reduction by using a computerized cost-containment program which included an inaccurate fee schedule to reduce the medical expenses on a systematic basis.[37] Plaintiffs allege that this conduct was designed to reduce the insureds' PIP and Medpay benefits.[38] Allstate allegedly uses an internal fee schedule code (A1 or other similar code) "which is a designation that a medical charge exceeds the reasonable amount for the procedure in the region where the service was provided."[39]

Plaintiffs further allege that Allstate through the use of a computer data base developed by National Biosystems -- also known as ADP Integrated Medical Solutions, Inc. or IMS -- systematically reduces medical charges to "the 85th percentile" without considering the condition

---

expenses arising from the accident and incurred within three years from the date thereof[.] TEX. INS. CODE ANN. art. 5.06-3(b) (Vernon 1981).

[34] Id. at 315, 317. The Declarations showing liability limits are not part of the record.

[35] Docket no. 29 at 2.

[36] Id.

[37] Docket no. 29 at 2.

[38] Id.

[39] Id. at 2-3.

7

or age or the patient or the special certifications or qualifications of the provider.[40] Plaintiffs contend that Allstate has made such reductions without utilizing any relevant or legitimate data with which to compare medical charges in the region where the services were provided and that Allstate does not consider the usual and customary fees of similar medical providers in the geographic area.[41] Plaintiffs allege Allstate has not disclosed that it relies on a third party service for an internal medical fee schedule by which to evaluate the reasonableness of medical charges.[42]

Allstate allegedly refuses to explain the rationale for the reductions and will not disclose its criteria for determining the reductions.[43] According to plaintiffs' allegations, Allstate's position that a charge is not reasonable or customary may be stated in an explanation of benefits or in a letter sent to the insured.[44] One such letter written to plaintiffs' counsel regarding a claim from plaintiff Peter Gloria provides:

> I recently received a medical bill from CRAIG HONER for treatment your client received following the auto accident that occurred on the date shown above. Based on our review of the information submitted, I have sent a check to the health care provider for an amount less than the billed charges along with an Explanation of Benefits. Enclosed is a copy for your records.[45]
>
> Your client's policy provides benefits for reasonable expenses for necessary

---

[40] Id. at 3.

[41] Id.

[42] Id.

[43] Id. at 4.

[44] Docket no. 29 at 4.

[45] The Explanation of Benefits is not part of the record.

8

medical and funeral services because of bodily injury caused by an auto accident. We review all bills to ensure that the treatment and charges meet these criteria. Based on our review of information available to us, not all of the treatment or charges appear to meet these requirements.

We are committed to the protection of our customers' interests. The provider may seek further review with us should there be disagreement with our evaluation. In the event that we are unable to reach an agreement with the provider, we intend to defend and, if necessary, indemnify our customer up to policy limits against actions that health care providers may take. We will also consider any other appropriate measures to protect our customer should the health care provider decide to pursue collection efforts for the unpaid portion of the bill that is causally related to the accident.[46]

Plaintiffs allege that this letter is an example of Allstate's intentionally vague and deceptive representations and that insureds are deceived into believing that Allstate is complying with the Texas Personal Automobile Policy and the Texas Department of Insurance when it is not.[47]

Plaintiffs contend they believe, to the best of their knowledge as lay persons, that the treatment by their providers and the resulting charges were necessary and reasonable.[48] Plaintiffs further contend that they agreed to compensate their doctors for all medical treatment rendered to them arising out of their accidents and that they are subject to liability for the unpaid balance of their bills.[49] According to plaintiffs' allegations, Allstate's practice of reducing medical charges "interferes and conflicts with the physician-patient relationship and places the patient in a tug-of-war between the insurance company and the medical provider."[50] Allegedly, Allstate's practice

---

[46] Docket no. 29, exhibit letter from Veronica McCullough.

[47] Id. at 5.

[48] Docket no. 29 at 5.

[49] Id.

[50] Id.

9

also causes Texas insureds to be subject to credit damage.[51]

Specifically, plaintiffs allege that plaintiff Gloria presented Allstate with allegedly reasonable medical charges of $5,849.50 and that Allstate allegedly reduced these charges by $334.40.[52] Gloria admits that he received from Allstate the full PIP coverage of $2,500.[53] Plaintiffs also contend that plaintiff Perez presented Allstate with allegedly reasonable medical charges of $2,241.00 and that Allstate allegedly reduced these charges by $65.[54] Plaintiffs allege that Allstate reduced the presented medical charges because the amounts were unreasonably high for plaintiffs' geographical region which Allstate did not identify.[55]

Plaintiffs have brought this class action, individually and on behalf of all similarly situated Allstate insureds, alleging that Allstate systematically, wrongfully, and improperly reduced medical bills for services provided to the insureds covered under the PIP and Med-Pay provisions of their personal automobile insurance policies.[56] As stated above plaintiffs federal claims allege violations of RICO and of the Sherman antitrust Act; their state claims allege violations of Texas Insurance Code and the DTPA as well as breach of contract.

Allstate has moved to dismiss pursuant to Rule 12(b)(1) arguing that the Court lacks

---

[51] Id.

[52] Docket no. 29 at 8.

[53] Id.

[54] Id.

[55] Id.

[56] Docket no. 29 at 1.

10

jurisdiction because plaintiffs have no standing to bring their claims.[57] In addition, Allstate has moved to dismiss plaintiffs' antitrust claim pursuant to Rule 12(b)(6) arguing that plaintiff has failed to state a claim against Allstate for antitrust violations.[58] Finally, Allstate has moved to strike or dismiss plaintiffs' class action allegations pursuant to Rule 12(f) arguing that plaintiffs' claims are "inherently unsuitable" for a class action.[59]

## IV. ISSUES

1.  Whether plaintiffs have standing to assert their claims.

2.  Whether plaintiffs have state a cause of action for antitrust violations.

3.  Whether plaintiffs allegations are inherently unsuitable for class action treatment.

## V. STANDARDS FOR MOTIONS TO DISMISS

A.   Fed. R. Civ. P. 12(b)(1)

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure permit a party to challenge the subject matter jurisdiction of the district court to hear a case.[60] Lack of subject matter jurisdiction may be found in one of three instances: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."[61] The burden of

---

[57] Docket no. 34.

[58] Docket no. 32.

[59] Docket nos. 36 and 37.

[60] FED.R.CIV.P. 12(b)(1).

[61] Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir.), cert. denied 454 U.S. 897 (1981); see Barrera-Montenegro v. United States, 74 F.3d 657, 659 (5th Cir. 1996).

11

proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction.[62]  Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist.[63]

A facial attack on subject matter jurisdiction requires the court to decide if the plaintiff has correctly alleged a basis for subject matter jurisdiction.[64]  Such an attack is valid if from the face of the pleadings, the court can determine it lacks subject matter jurisdiction.[65]  In examining a Rule 12(b)(1) motion, the district court is also empowered to consider undisputed matters of fact reflected in the record.[66]  Ultimately, a motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his or her claim that would entitle him or her to relief.[67]  "A case is properly dismissed for lack of subject matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate the case."[68]

When a Rule 12(b)(1) motion is filed with a Rule 12(b)(6) motion, the court should always consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the

---

[62] McDaniel v. United States, 899 F.Supp. 305, 307 (E.D. Tex. 1995), aff'd, 102 F.3d 551 (5th Cir. 1996).

[63] Menchaca v. Chrysler Credit Corp., 613 F.2d 507, 511 (5th Cir.), cert. denied 449 U.S. 953 (1980).

[64] Venture I, Inc. v. Orange County, Tex., 947 F.Supp. 271, 276 n. 7 (E.D. Tex. 1996).

[65] Id.

[66] Williamson, 645 F.2d at 413.

[67] Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss., 143 F.3d 1006, 1010 (5th Cir. 1998).

[68] Id. (quoting Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1187 (2d Cir.1996)).

12

merits.[69] This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice. The court's dismissal of a plaintiff's case because the court lacks subject matter jurisdiction is not a determination of the merits and does not prevent the plaintiff from pursuing a claim in a court that does have proper jurisdiction.[70] A motion to dismiss pursuant to Rule 12(b)(1) is analyzed under the same standard as a motion to dismiss under Rule 12(b)(6).[71]

**B.    Fed. R. Civ. P. 12(b)(6)**

Under Rule 12(b)(6), Fed. R. Civ. P., plaintiff must state a claim upon which relief can be granted or the complaint may be dismissed with prejudice as a matter of law. A motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted."[72] When considering a motion to dismiss for failure to state a claim, all factual allegations in the complaint must be taken as true and construed favorably to the plaintiff.[73] The United States Supreme Court has elaborated:

Nothing in Rule 12(b)(6) confines its sweep to claims of law which are obviously

---

[69] Hitt v. Pasadena, 561 F.2d 606, 608 (5th Cir. 1977) (per curiam).

[70] Id.

[71] Home Builders Ass'n of Miss., 143 F.3d at 1010.

[72] Kaiser Aluminum & Chem. Sales, Inc. v. Avondale, 677 F.2d 1045, 1050 (5th Cir.), cert. denied, 459 U.S. 1105, 103 S.Ct. 729 (1982) (quoted in Capital Parks, Inc. v. Southeastern Advertising & Sales Sys., Inc., 864 F.Supp. 14, 15 (W.D. Tex. 1993), affirmed, 30 F.3d 627 (5th Cir. 1994)).

[73] Fernandez-Montez v. Allied Pilots Assoc., 987 F.2d 278, 284 (5th Cir. 1993). See Capital Parks, Inc., 30 F.3d at 629 ("A court's decision to dismiss for failure to state a claim may be upheld 'only if it appears that no relief could be granted under any set of facts that could be proven consistent with the allegations.' Baton Rouge Bldg. & Constr. Trades Council AFL-CIO v. Jacobs Constructors, Inc., 804 F.2d 879, 881 (5th Cir. 1986).") See also O'Quinn v. Manuel, 773 F.2d 605, 608 (5th Cir. 1985).

13

insupportable. On the contrary, if as a matter of law "it is clear that no relief could be proved consistent with the allegations," a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one.[74]

A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.[75] Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.[76] This is a rigorous standard, but subsumed within it is the requirement that a plaintiff state its case with enough clarity to enable the court and the opposing party to determine whether a claim is alleged.[77]

C.    Fed. R. Civ. P. 12(f).

Rule 12(f) provides that a party may move to have stricken from pleadings " any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[78] As with other Rule 12 motions to dismiss, a Rule 12(f) motion to strike is generally disfavored.[79] When considering a Rule 12(f) motion to strike, the Court construes all factual allegations opposed as

---

[74] Neitzke v. Williams, 490 U.S. 319, 327, 109 S. Ct. 1827, 2232 (1989) (quoting Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232 (1984)).

[75] Conley, 355 U.S. at 45-46, 78 S.Ct. at 102.

[76] Jefferson v. Lead Indus. Ass'n, Inc., 106 F.3d 1245, 1250 (5th Cir. 1997); Tuchman v. DSC Communications Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); Fernandez-Montes, 987 F.2d at 284.

[77] Elliott v. Foufas, 867 F.2d 877, 880 (5th Cir. 1989).

[78] FED. R. CIV. P. 12(f).

[79] Kaiser Aluminum, 677 F.2d at 1057.

14

true.[80]

# V. ARGUMENTS AND CONCLUSIONS OF LAW

**A.**   **Plaintiffs' standing to bring their federal claims**

Plaintiffs have alleged that Allstate violated 18 U.S.C. § 1962(c) by unlawfully participating in an association-in-fact enterprise with IMS through a pattern of racketeering activity in the form of mail and wire fraud, subjecting plaintiffs to liability for unpaid medical bills.[81] Plaintiffs also allege that Allstate violated the antitrust laws, specifically 15 U.S.C. § 1, by conspiring and/or contracting with IMS to illegally fix or restrain the amounts Allstate would pay as reimbursement for health care expenses incurred by its insureds.[82] Relying on Rule 12(b)(1), Defendants have moved to dismiss the RICO and Sherman antitrust claims arguing that plaintiffs failed to invoke the Court's jurisdiction because they lack standing to bring their claims. In particular, Allstate argues that plaintiffs have not alleged any actual or threatened injury resulting from Allstate's alleged conduct.

Standing is jurisdictional under Article III of the Constitution, and plaintiffs lacking standing may not litigate their claims in federal court.[83] The constitutional minimum of standing includes three elements: (1) an injury-in-fact; (2) a causal connection between the injury and the conduct complained of; and (3) the likelihood that the injury will be redressed by a favorable

---

[80] See id at 1047, 1060.

[81] Docket no. 29 at 15-17.

[82] Docket no. 29 at 13-15.

[83] Meadowbriar Home for Children v. Gunn, 81 F.3d 521, 529 (5th Cir. 1996).

15

decision.[34] The party invoking federal jurisdiction bears the burden of establishing these elements.[35] "The litigant must clearly and specifically set forth facts sufficient to satisfy these Article III standing requirements."[36] Each element should be supported in the same manner as any other matter on which the plaintiff has the burden of proof.[37] Thus, "[a]t the pleading stage, general factual allegations of injury resulting from defendant's conduct may suffice, for on a motion to dismiss we 'presume that general allegations embrace those specific facts that are necessary to support the claim.'"[38] However, dismissal is appropriate at the pleadings stage "if the complaint itself shows a bar to relief -- when this happens it is 'beyond doubt' that no set of facts will allow plaintiff to prevail."[39]

"Injury-in-fact" is an invasion of a legal right that is "(a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.'"[90] "Particularized" means the injury affects the plaintiff in an individual and personal way.[91] "Allegations of possible future injury do not satisfy the standing requirement of Article III. A threatened injury must be 'certainly

---

[84] Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136 (1992).

[85] Lujan, 504 U.S. at 561, 112 S.Ct. at 2136.

[86] Whitmore v. Arkansas, 495 U.S. 149, 155, 110 S.Ct. 1717, 1723 (1990).

[87] Id.

[88] Lujan, 504 U.S. at 561, 112 S.Ct. at 2137 (quoting Lujan v. National Wildlife Federation, 497 U.S. 871, 889, 110 S.Ct. 3177, 3189 (1990)).

[89] Mahone v. Addicks Util. Dist. of Harris County, 836 F.2d 921, 926 (5th Cir. 1988) (citing Clark v. Amoco Prod. Co., 794 F.2d 967, 970 (5th Cir. 1986)).

[90] Lujan, 504 U.S. at 560, 112 S.Ct. at 2136.

[91] Id., 504 U.S. at 561 n.1, 112 S.Ct. at 2136 n.1.

16

impending' to constitute injury-in-fact."[92]

Even accepting plaintiffs' allegations in the second amended complaint as true, the Court concludes that plaintiffs have failed to state an injury-in-fact. Plaintiffs contend that because of Allstate's allegedly illegal RICO conduct, plaintiffs "have suffered damages and liability to the extent of their unpaid bills plus interest."[93] Plaintiffs also have pleaded that they "are subject to legal liability for the unpaid balance of their bills."[94] What plaintiffs have pleaded is the possibility that at some time in the future their "property" will be injured by Allstate's determination of reasonable medical expenses.[95] That the harm is not imminent or actual is

_____

[92] Whitmore, 495 U.S. at 158, 110 S.Ct. at 1724-25 (quoting Babbitt v. Farm Workers, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308-09 (1979) (citations omitted)). To have standing under Sherman antitrust and RICO laws, a private plaintiff must be "injured in his business or property." 15 U.S.C. § 15(a) (1997); 18 U.S.C. § 1964(c) (2000). Under the Sherman antitrust laws, a private plaintiff must also establish that the injury is an antitrust injury. Doctor's Hosp. of Jefferson, Inc. v. Southeast Medical Alliance, 123 F.3d 301, 305 (5th Cir. 1997.

[93] Docket no. 29 at 16.

[94] Docket no. 29 at 5.

[95] The parties have cited several state court decisions in support of their arguments. LaMothe v. Auto Club Ins. Ass'n, 543 N.W.2d 42, 44 (Mich. App. Ct. 1995, pet. denied) and McGill v. Automobile Ass'n of Mich., 526 N.W.2d 12, 14 (Mich. App. Ct. 1994), cited by Allstate, support the conclusions reached here. In each of these cases, the insurance company reduced the medical charges to what the company determined was a reasonable rate and agreed to defend, indemnify, and/or protect the insureds from future liability because of the reductions. The Michigan Appeals Court found that because the plaintiffs failed to assert factual allegations of actual or threatened injury, they failed to plead a case or controversy. Plaintiffs rely on Puritt v. Allstate, 672 N.E.2d 353, 356 (Ill. App. Ct. 1996, pet. denied) in which the Illinois Appeals Court reversed a finding that the insureds lacked standing. The court concluded the insureds did not have to wait for lawsuits to be filed or collection attempts to be made before there was injury-in-fact. However, the Illinois state law action in Puritt is factually distinct from the case at issue because Puritt alleged that he paid the balance not paid by Allstate. Id, at 354. In addition, a health care provider, who was not paid the full amount charge for the services provided, was included as a plaintiff. Id.

17

particularly obvious in light of plaintiffs' allegations that Allstate's allegedly illegal conduct occurred in 1997 and 1998 and, even though the fact that plaintiffs' twice amended their complaint, the amended complaint contains essentially the same general allegations regarding possible injury as the original complaint filed in June 1999. There are no allegations that a health care provider who was not fully reimbursed by Allstate has challenged the determination of what are reasonable expenses, billed plaintiffs for balance, threatened to sue for the balance, or threatened to resort to a collection agency for payment of the balance. Moreover, plaintiffs do not allege that Allstate has failed to fulfill its promise to defend and indemnify plaintiffs in the event of any legal action brought against them or that Allstate failed to protect plaintiffs from collection attempts. As to plaintiff Gloria, the Court is particularly puzzled by the apparent lack of injury. It appears from the second amended complaint that, in addition to making assurances to defend, Allstate paid Gloria the maximum PIP benefits due under the policy. Even if Gloria were correct that Allstate's method of calculating payment is incorrect, Gloria's PIP benefits would still not exceed $2,500. In sum, because plaintiffs have alleged speculative rather than actual or threatened liability for the unpaid balance of their medical bills, plaintiffs lack standing to bring their RICO claims.[96]

---

[96] See Price v. Pinnacle Brands, Inc., 138 F.3d 602, 606 (5th Cir. 1998) (because pleadings failed to show tangible financial loss to plaintiffs, "plaintiffs' conclusional allegations, unaccompanied by assertions of even general fact to show injury, fail to satisfy the RICO standing requirement); In Re Taxable Mun. Bond Sec. Litig., 51 F.3d 518, 522 (5th Cir. 1995) (no standing because plaintiff failed to establish eligibility for loan program); see also Maio v. Aetna, Inc., 221 F.3d 472, 475 (3rd Cir. 2000) (no RICO injury when "predicated exclusively on the possibility that future events might occur, rather than on the actual occurrence of those events and their present effect on the value of the health care insurance appellants received"); Mira v. Nuclear Measurements Corp., 107 F.3d 466, 474 (7th Cir. 1997) ("plaintiffs have failed to establish that they or the plan suffered an injury (i.e., economic loss) as a result of the defendant's conduct).

As to plaintiffs' antitrust claims, plaintiffs allege that Allstate's conduct limited reimbursement that would be paid for covered medical services, limited the type of medical services that would be covered, and discouraged insureds from seeking needed medical services that were unaffordable other than through the insurance policy with Allstate.[77] With respect to limiting reimbursement to reasonable charge for necessary medical services, the foregoing discussion of plaintiffs' failure to allege injury-in-fact in their RICO claim applies as well to the antitrust claim. Plaintiffs have not alleged that they suffered an actual or threatened injury because of Allstate's limited reimbursement of medical charges. With respect to plaintiffs' other alleged antitrust injuries -- limiting medical services and discouraging insureds from seeking needed medical service -- plaintiffs generally allege only that Allstate's conduct "interferes and conflicts with the physician-patient relationship and places the patient in a tug-of-war between the insurance company and the medical provider."[78] There are no specific factual allegations suggesting that either plaintiff received limited medical services, did not seek medical services, or suffered any conflict or interference in a relationship with their health care provider because of Allstate's conduct. Thus, plaintiffs have failed to allege an actual or threatened injury that would entitle them to bring a Sherman antitrust claim against Allstate.

In sum, plaintiffs have failed to state an injury-in-fact. Although plaintiffs generally allege that they have been injured and suffered damages, their supporting allegations which describe the injury and harm set forth a possible injury they could suffer in the future and not a

---

[77] Docket no. 29 at 14.

[78] Id. at 5.

19

"certainly impending" injury or an actual injury already suffered.[99] Therefore, Allstate's Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is granted, and plaintiffs' federal RICO and Sherman antitrust claims are dismissed.

**B.    Have plaintiffs stated a Sherman antitrust claim**

Allstate has moved to dismiss plaintiffs' Sherman antitrust claim pursuant to Rule 12(b)(6).[100] In particular, Allstate argues that plaintiffs have failed to state an antitrust injury, an essential element of an antitrust claim.[101]

To pursue an antitrust claim, plaintiff must show: "(1) injury in fact, an injury to the plaintiff proximately caused by the defendant's conduct; (2) antitrust injury; and (3) proper plaintiff status, which assures that other parties are not better situated to bring suit."[102] An antitrust injury is an

> injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or the anticompetitive acts made possible by the violation. It should in short be "the type of loss that the claimed

---

[99] See Lewis v. Casey, 518 U.S. 343, 357, 116 S.Ct. 2174, 2183 (1996) ("That a suit may be a class action ... adds nothing to the question of standing, for even named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent.'" Citing Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 40, n. 20, 96 S.Ct. 1917, 1925, n. 20 (1976), quoting Warth v. Seldin, 422 U.S. 490, 502, 95 S.Ct. 2197, 2207 (1975)).

[100] Docket no. 32.

[101] Docket no. 33 at 2-4.

[102] Doctor's Hosp., 123 F.3d at 305.

20

violations . . . would be likely to cause.[103]

The Supreme Court in Blue Shield of Virginia, v. McCready,[104] discussed allegations that set forth a private cause of action for antitrust violations. The Court explained

> McCready charges Blue Shield with a purposefully anticompetitive scheme. She seeks to recover as damages the sums lost to her as the consequence of Blue Shield's attempt to pursue that scheme. She alleges that Blue Shield sought to induce its subscribers into selecting psychiatrists over psychologists for the psychotherapeutic services they required, and that the heart of its scheme was the offer of a Hobson's choice to the subscribers. Those subscribers were compelled to choose between visiting a psychologist and forfeiting reimbursement, or receiving reimbursement by forgoing treatment by the practitioner of their choice.[105]

The Court further noted that "[a]lthough McCready was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market.[106]

Assuming for argument's sake that plaintiffs have alleged injury from Allstate's conduct, plaintiffs have not alleged any anticompetitive effect of Allstate's acts or how any anticompetitive acts were made possible by Allstate's conduct. As stated above Plaintiffs' allege that Allstate's conspiracy and/or contract with IMS was a scheme to fix or restrain the amount of reimbursement due for medical services, limit the type of medical services, and discourage the use of needed medical services. These allegations do not specify any specific market that

---

[103] Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697 (1977) (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 125, 89 S.Ct. 1562, 1577 (1969)) (emphasis added).

[104] 457 U.S. 465, 483, 102 S.Ct. 2540, 2550 (1982).

[105] Id.

[106] McCready, 457 U.S. at 484, 102 S.Ct. at 2551.

21

Allstate targeted for injury by its relationship with IMS or that plaintiffs were in someway injured by any anticompetitive acts targeted at some market. Plaintiffs do not allege that they were required to forego treatment by any specific health care provider in favor of another. Their allegations merely state that Allstate reviewed their medical expenses and reduced them to what Allstate determined was a reasonable rate. If a health care provider concluded that Allstate's decision was incorrect, it would be free to pursue collection efforts against the policy holder -- which Allstate would then defend -- or against Allstate directly. Plaintiffs have not alleged either has occurred.

Therefore, because plaintiffs failed to allege an antitrust injury, they have not stated a cause of action under the Sherman Antitrust Act. Allstate's Rule 12(b)(6) motion to dismiss is granted and plaintiffs' Sherman antitrust claim is dismissed.

**C.    Should plaintiffs' class action allegations related to federal claims be stricken**

Defendants have moved under Rule 12(f) to strike plaintiffs' class action allegations arguing that plaintiffs have not pleaded facts sufficient to demonstrate that the prerequisites of Federal Rule of Civil Procedure 23 are met.[107] Rule 23 requires that the representatives must suffer the same injuries as the class members they seek to represent.[108] Because plaintiffs allege only that they wish to represent other similar to them and in light of the Court's conclusion that plaintiffs lack standing to bring the federal claims because they have not alleged injury-in-fact, the proposed class would appear to lack standing as well since "similar" class members would

---

[107] Docket nos. 36 and 37 at 2.

[108] Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 625-26, 117 S.Ct. 2231, 2251 (1997) (quoting East Tex. Motor Freight Sys., Inc. v. Rodriguez, 431 U.S. 395, 403, 97 S.Ct. 1891, 1896 (1977)).

22

not have suffered actual injury.

Conclusory class allegations, such as those pleaded by plaintiffs here, have been deemed suitable for dismissal early in the case.[109] When plaintiffs' allegations are analyzed in light of the prerequisites of Rule 23, plaintiffs have not alleged common issues that predominate. Instead, issues such as whether a particular provider's charge was reasonable and/or necessary for a particular treatment for a particular injury in a particular location must be determined on an individualized basis. Each putative plaintiff would be required to prove entitlement to benefits under the terms of the policy[110] and that the medical expenses were reasonable and the services were necessary.[111] Moreover, even if plaintiffs prove the computerized evaluation of the PIP claims was flawed the parties and the Court still will need to analyze each charge on every claim for reasonableness and necessity. Finally, courts have found that class actions are not appropriate in antitrust or RICO cases when individualized questions of injury predominate.[112]

---

[109] See In Re Am. Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir. 1996) ("Mere repetition of the language of Rule 23(a) is not sufficient. There must be an adequate statement of the basic fact to indicate that each requirement of the rule is fulfilled."); Cook County College Teachers Union v. Byrd, 456 F.2d 882, 885 (7th Cir.) ("[The Union] was obliged in its complaint to allege facts bringing the action within the appropriate requirements of the Rule"), cert. denied, 409 U.S. 848 (1972); Minority Police Officers Ass'n v. city of South Bend, 555 F.Supp. 921, 924 (N.D. Ind.) ("Specific facts must be alleged sufficient to meet the requirements of the rule, as mere repetition of the rule or loosely defined classwide allegations are insufficient"), aff'd in part, appeal dismissed on other grounds, 721 F.2d 197 (7th Cir. 1983); see also Doctor v. Seaboard Coast Line R.R. Co., 540 F.2d 699, 706-10 (4th Cir. 1976) (denying class certification because plaintiff provided no facts about the existence of alleged class);.

[110] Western Alliance Ins. Co. v. Northern Ins. Co., 176 F.3d 825, 828 (5th Cir. 1999).

[111] TEX.INS.CODE art. 5.06-3(b).

[112] See Alabama v. Blue Bird Body, 573 F.2d 309, 327-28 (5th Cir. 1978) (fact that each putative plaintiff had to prove conspiracy in particular geographical area and payment of "supracompetive" price which depended on quality and price of bus precluded antitrust class

23

In sum, plaintiffs are not adequate class representative because they lack standing and have no cause of action. In addition, their class allegations do not allege facts suggesting that common issues, other than Allstate's allegedly flawed computerized reductions in medical expenses, predominate. Therefore, to the extent the Court has jurisdiction to address plaintiffs' class allegations, when plaintiffs' lack of standing -- and when the purported class would appear to lack standing as well -- Allstate's motion to strike the class allegations is granted as to the federal claims and the class allegations as to the federal claims are stricken.

## VI. STATE CLAIMS

Having determined that the Court lacks jurisdiction over plaintiffs' federal claims because plaintiffs lack standing to bring them, the Court must now determine how to dispose of plaintiffs' state law claims. The 28 U.S.C. §1367 provides:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that the form part of the same case or controversy under Article III of the United States Constitution.[113]

In this case, the Court dismisses plaintiffs' federal claims for lack of standing, requisite of

---

action); Windham v. American Brands, Inc., 565 F.2d 59, 65 (4th Cir. 1977) (crux of antitrust action "is injury, individual injury. While a case may present a common question of violation, the issues of injury and damage remain the critical issues in such a case and are always strictly individualized."), cert. denied, 435 U.S. 968 (1978); In Re Beef Indust. Antitrust Litig., 1986 WL 8890, at * 1 (S. D. Tex. June 3, 1986) ("critical issues of injury and damage are inherently individualized" unless subject to mechanical or formula calculation); Abernathy v. Baush & Lomb, Inc., 97 F.R.D. 470, 474-75 (N.D. Tex. 1983) (because proof of actual anticompetitive injury in private antitrust cases is highly individualistic, courts generally find antitrust " claims ill-suited for maintenance as class actions") (citations omitted); Kahler v. Firstplus Fin. Inc., 248 B.R. 60, 77 (Bankr. N. D. Tex. 2000) (RICO class action not proper because "each member would have to prove legal causation").

[113] 28 U.S.C. 1367(a).

jurisdiction under Article III. Therefore, because the Court did not have original jurisdiction over plaintiffs' federal claims , it may not exercise the supplemental jurisdiction provided by section 1367. Thus, plaintiffs' state claims, including the allegations for a state class action, under the Texas Insurance Code article 21.21 and the DTPA as well as the claim for breach of contract are dismissed without prejudice to filing in state court.

## VII. CONCLUSION

Because plaintiffs lack standing to bring their federal claims such that the Court lacks jurisdiction, Allstate's Rule 12(b)(1) motion[114] is GRANTED and plaintiffs' RICO and Sherman antitrust claims are DISMISSED. Assuming that plaintiffs' second amended complaint alleges injury and standing, Allstate's Rule 12(b)(6) motion to dismiss plaintiffs' Sherman antitrust claim[115] is GRANTED on the ground that plaintiffs have failed to state a claim upon which relief may be granted and their antitrust claim is DISMISSED. As plaintiffs have failed to adequately allege the prerequisites of a federal class action, Allstate's Rule 12(f) motion to strike the federal class action allegations[116] is GRANTED and plaintiffs' class action allegations related to RICO and Sherman antitrust violations are STRICKEN. In light of the Court's disposition of plaintiffs' federal class action allegations, plaintiffs' motion to certify a class action[117] are DISMISSED as moot.

Because no federal claim remains in this lawsuit, plaintiffs' state claims under the Texas

---

[114] Docket no. 34.

[115] Docket no. 32.

[116] Docket no. 36.

[117] Docket no. 16.

25

Insurance Code article 21.21 and the DTPA as well as the claims for breach of contract are DISMISSED without prejudice to re-filing in state court, as may be permitted by state law and procedure. Plaintiffs' class action allegations related to the state claims are also DISMISSED without prejudice to re-filing in state court.

The Clerk shall enter judgment accordingly and providing that each side shall bear its own costs.

IT IS SO ORDERED.

SIGNED and ENTERED this 29 day of September, 2000.

Pamela A. Mathy
United States Magistrate Judge

26

# EXHIBIT   E

Westlaw.

Not Reported in A.2d
1998 WL 409346 (Del.Ch.)
(Cite as: 1998 WL 409346 (Del.Ch.))

Page 1

C

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

Samuel L. GUY
v.
James H. SILLS, Jr.

No. Civ.A. 16201.

July 10, 1998.

Samuel L. Guy, Wilmington, DE, Carolyn R. Schlecker, Wilmington, DE.

CHANDLER, Vice Chancellor.

*1 Dear Counsel:

On February 5, 1998, the Wilmington City Council (the "Council") approved Ordinance No. 98-005 (the "Ordinance") that was sponsored by plaintiff Samuel L. Guy ("Guy"). The Ordinance related to the redevelopment of the Christiana Riverfront and, *inter alia,* mandated compliance with a plan for the hiring of city residents as a condition of granting business licenses to operate the waterfront zoning district. The Ordinance was certified to the Mayor for his consideration pursuant to Section 2-202 [FN1] of the City of Wilmington Charter (the "Charter").

> FN1. Section 2-202 of the Charter provides in pertinent part:
> Each ordinance shall, before it takes effect, be certified to the Mayor for his approval.

The Mayor shall sign the ordinance if he approves it, whereupon it shall become law. If he disapproves it, he shall return it to the Council with the reasons for his disapproval within ten (10) days after he receives it. If the Council shall pass the ordinance by a vote of two-thirds of all its members within fifteen (15) days after the ordinance has been returned with the Mayor's disapproval, it shall become law without his approval. If the Mayor does not return the ordinance within the time required, it shall become law without his approval.

By letter dated February 12, 1998, the Mayor returned the Ordinance to the Council noting his disapproval and his reasons for disapproval, namely his belief that the Ordinance is unconstitutional. The Council did not vote to override the Mayor's veto of the Ordinance within the fifteen-day period mandated by Section 2-202. Accordingly, the Ordinance did not become law.

On February 20, Guy filed suit requesting the Court to void the Mayor's veto of the Ordinance, claiming that the Mayor is impermissibly interested in the defeat of the Ordinance. Guy further alleges that the Mayor's conduct in vetoing the Ordinance constitutes "an abuse of his office in violation of the common law and statutory prohibitions." [FN2]

> FN2. Compl.. 10.

Thereafter, the Mayor moved to dismiss Guy's lawsuit based on the following assertions: 1) plaintiff's lack of standing; 2) this Court's lack of subject matter jurisdiction; and 3) mootness of Guy's claims. Guy responded to the Mayor's motion to dismiss, but failed to address *any* of the grounds for dismissal that the Mayor asserted. Instead, Guy merely realleges several of the assertions from his complaint, asserts further that the Mayor was acting

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
1998 WL 409346 (Del.Ch.)
(Cite as: 1998 WL 409346 (Del.Ch.))

Page 2

in a legislative (as opposed to executive) capacity when he vetoed the Ordinance, and urges the Court not to grant the Mayor's motion to dismiss because "there are several other cases that can be filed based upon the same concerns relative to Mayor Sills ... that squarely put him in a conflict of interest position." [FN3]

> FN3. Response In Opposition To The Motion To Dismiss at 1.

A complaint will be dismissed where, under any set of facts consistent with the facts alleged in the complaint, the plaintiff would not be entitled to judgment. [FN4] Further, where a plaintiff's allegations are merely conclusory (*i.e.*, without specific allegations of fact to support them) they are similarly insufficient to withstand a motion to dismiss. [FN5] Here, Guy has not alleged facts that, if proved true, would entitle him to judgment.

> FN4. *See Lewis v. Vogelstein*, Del.Ch., 699 A.2d 327, 338 (1997) (citing *Rabkin v. Philip A. Hunt Chem. Corp.*, Del.Supr., 498 A.2d 1099 (1985)).

> FN5. *Id.*

To obtain standing, a plaintiff must demonstrate that he has an interest "distinguishable from the interest shared by other members of a class or the public in general." [FN6] That is, a plaintiff must assert facts that he has been injured in a way that is unique to him in his individual capacity, and not, for example, in his capacity as a member of the Council. Here, Guy's assertions do not meet this standard. Guy alleges that he is a resident of Wilmington and an at-large member of the Council. But, neither of these assertions (nor the other assertions included in the complaint) provides a basis for concluding that Guy has suffered an injury-in-fact as a result of the Mayor's allegedly improper conduct . [FN7] Accordingly, Guy lacks standing to maintain his lawsuit.

> FN6. *Harrington v. Hollingsworth*, Del.Super., C.A. No. 89C-JL3, Lee, J. (Dec. 20, 1996), slip op. at 6.

> FN7. *See Raines v. Byrd*, 521 U.S. 811, ---, 117 S.Ct. 2312, 2318, 138 L.Ed.2d 849 (1997) (dismissing claim challenging the federal Line Item Veto Act for lack of standing because "the injury claimed by the Members of Congress here is not claimed in any private capacity but solely because they are Members of Congress.").

*2 The Mayor's motion to dismiss is granted. I need not consider the other grounds advanced by the Mayor or reasons to dismiss Guy's complaint.

IT IS SO ORDERED.

1998 WL 409346 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT   F

RECEIVED 11/17/99
DOCKETED ✓ _____ CKET
DIARIED _____

STATE OF MISSOURI    )
CITY OF ST. LOUIS    )  SS
                     )

MISSOURI CIRCUIT COURT
TWENTY-SECOND JUDICIAL CIRCUIT
(St. Louis City)

DENISE KINNARD, et al.,    )
        Plaintiffs,        )
                           )
            vs.            )    Cause No. 992-00812
                           )    Division No. 1
ALLSTATE INSURANCE COMPANY, )
        Defendant.         )

<u>ORDER</u>

Defendant's Amended Motion to Stay and Amended Motion to Dismiss were called, heard, and submitted on October 26, 1999. The Court has considered the pleadings, motions, and arguments of the parties and now rules as follows.

Plaintiffs brought the present action as individuals and on behalf of a class of persons insured by Defendant, Allstate Insurance Company. Plaintiffs claim that Allstate denied full payment of medical bills under the medical payment coverage of its policies. The named plaintiffs allege that they were injured in automobile accidents, that medical bills were submitted to Allstate, and that Allstate refused to pay the bills in full, on the ground that the charges were unreasonably excessive.

Allstate seeks an order staying the present action in favor of two actions against Allstate pending in federal court in Illinois.[1] The two Illinois actions seek declaratory relief.

---

[1] <u>Puritt v. Allstate Ins. Co.</u>, No. 99C 4238 (N.D.Ill.) and <u>Loizon v. Allstate Ins. Co.</u>, No. 99C 4237 (N.D.Ill.).

equitable relief, and damages for Allstate's alleged failure to pay fully under its medical payment coverage for expenses incurred as a result of automobile accidents. The Illinois cases have been pending since 1995, and it is the Court's understanding that neither case has yet been certified as a class action.

Allstate contends that the present case is wholly subsumed by the class actions alleged in the Illinois cases, that the issues in the Illinois actions are parallel to the issues in the present action, and that the actions involve the same putative class. Therefore, Allstate concludes, the present action is duplicative of the Illinois actions. Plaintiffs counter that the present case does not involve the same activity, because the present action seeks statutory relief pursuant to Missouri's vexatious refusal statute, § 375.420 RSMo, and involves Missouri plaintiffs, unlike the Illinois actions.

The decision whether the grant or refuse a stay of proceedings, on the ground that another action is pending, is discretionary with the trial court. Green v. Miller, 851 S.W.2d 553 (Mo.App. W.D. 1993). The pending Illinois cases, although brought as putative class actions, are not deemed class actions until certified as such pursuant to Rule 52.08. Until certified by the court as a class action, an action brought as a putative class action is brought only on behalf of the named plaintiffs. Beatty v. St. Louis Sewer Dist., 914 S.W.2d 791, 795 (Mo.banc 1995); see also, Parker v. Pulitzer Pub. Co., 882 S.W.2d 245 (Mo.App. E.D. 1994).

2

An action may be stayed where it involves the same parties, issues and relief as another pending action. <u>Searles v. Searles,</u> 495 S.W.2d 759, 761 (Mo.App. 1973). Allstate points out that, in determining whether a stay of proceedings is warranted, a court considers the desirability of avoiding a multiplicity of forums, the stage of the litigation, and the likelihood of obtaining complete relief in the foreign jurisdiction. However, the priority of filing, by itself, does not control whether a stay is appropriate. 1A C.J.S. <u>Actions</u> p. 736 (1985).

The uncertified Illinois cases remain merely putative class actions. Despite the age of the Illinois cases, the Court cannot ascertain whether these cases would afford relief to the plaintiffs in the present action. Accordingly, a stay, at this point in both the present case and the Illinois actions, is not appropriate. Allstate's Amended Motion for Stay is therefore denied.

Allstate also seeks an order dismissing Plaintiffs' class action allegations and the breach of contract claim brought by plaintiff Sam Bush. Allstate contends that Plaintiffs' class action allegations necessarily involve individual determinations of coverage; the nature, necessity, and extent of medical treatment; and the circumstances giving rise to Plaintiffs' injuries, and therefore are ill suited for a class action. In response, Plaintiffs contend that their alleged damages, albeit different, arise from common conduct on the part of Allstate, and that Plaintiffs represent a class of persons insured under the policies.

As noted above, an action allegedly brought on behalf of a class is brought only on behalf of the named plaintiffs until certified by the court. The file and court minutes indicate that the Court has not certified this action as a class action. Until and unless the action is so certified, the action is brought only on behalf of the named plaintiffs. Accordingly, it is premature to consider dismissal of an uncertified class action, on the grounds that the requirements for class certification have not been met.[3]

Allstate challenges the claim brought on behalf of plaintiff Bush, for failure to plead a compensable injury. Specifically, Allstate contends that Bush fails to state a cause of action for breach of contract, because the petition lacks facts indicating that Bush sustained damages.

A motion to dismiss for failure to state a claim is solely a test of the adequacy of the plaintiff's petition. The Court assumes that all of plaintiff's averments are true, and liberally grants to plaintiff all reasonable inferences therefrom. <u>Murphy v. A. A. Mathews, a Division of CRS Group Engineers, Inc.</u>, 841 S.W.2d 671, 672 (Mo.banc 1992). No attempt is made to weigh any facts as to whether they are credible or persuasive. Instead, the petition is reviewed to see whether the facts alleged meet the elements of a recognized cause of action, or of a cause that might be adopted in that case. <u>Nazeri v. Missouri Valley College</u>, 860 S.W.2d 303, 306 (Mo.banc 1993). An action for

---

[3] However, class action certification does not preclude subsequent dismissal for failure to state a claim. <u>Reinhold v. Fee Fee Trunk Sewer, Inc.</u>, 664 S.W.2d 599 (Mo.App. 1984).

4

breach of contract must allege (1) the making and existence of a contract between plaintiff and defendant; (2) defendant's violation of the contract; and (3) damages resulting from the breach. Lick Creek Sewer Systems, Inc. v. Bank of Bourbon, 747 S.W.2d 317, 324 (Mo.App. 1988).

Plaintiff alleges that Bush was involved in an automobile accident while operating a vehicle owned by a person insured by Allstate and that Bush was injured in the accident and incurred medical expenses. Plaintiffs' claim for breach of contract, as it pertains to Bush, alleges in part as follows:

> Allstate refused to pay Plaintiff Bush in full for a bill he submitted from Dr. Brenda Mills on the grounds that the charges for the medical treatment, services and/or products set forth in the bill exceeded the reasonable amount for the procedures in the region where the services were provided.

(First Amended Petition, ¶ 23). There is no allegation that Bush incurred any out-of-pocket expenses or paid the bill in full; rather, the First Amended Petition states only that "Plaintiff Bush has suffered damages in the amount of $13.00."

Although technical forms of pleading are not required in Missouri, a pleader must set forth sufficient facts to show that the pleader is entitled to relief. Rule 55.05; Love v. St. Louis City Bd. of Educ., 963 S.W.2d 364 (Mo.App. E.D. 1998). Mere conclusions, not supported by factual allegations, cannot be taken as true and cannot be considered in determining whether the petition states a cause of action. Id.

The pleading fails to state facts indicating how Bush's submission of damages to Allstate, and Allstate's refusal to pay "in full" gave rise to damages of $13.00. Although Bush

5

allegedly incurred expenses, there is no allegation that he was required to pay amounts, contrary to the terms of the Allstate policy. The mere conclusion that Bush had damages of $13.00 does not show how that sum relates in any way to Allstate's alleged actions. The breach of contract claim of plaintiff Bush is therefore dismissed for failure to state a claim.

<u>ORDER</u>

WHEREFORE, IT IS ORDERED that Defendant's Amended Motion to Stay is hereby denied; and

IT IS FURTHER ORDERED that Defendant's Amended Motion to Dismiss is granted as to the claims brought on behalf of plaintiff Bush and denied as to Plaintiffs' class action allegations.

SO ORDERED:

Michael B. Calvin, Presiding Judge

Dated: NOV. 15, 1999

cc: David T. Butsch, Attorney for Plaintiffs
    Roger K. Heidenreich, Attorney for Defendant

6

# EXHIBIT   G

Westlaw.

Not Reported in A.2d
2001 WL 755375 (Del.Super.)
(Cite as: 2001 WL 755375 (Del.Super.))

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

LIBERTY MUTUAL FIRE INSURANCE COMPANY, a foreign corporation, Plaintiff,
v.
David AMUNDSON and Jhennifer Amundson, Defendants.

No. CIV.A. 00C-03-029FSS.

Submitted: Feb. 20, 2001.
Decided: June 27, 2001.

Upon Cross Motion for Summary Judgment as to Declaratory Judgment--Motions Granted, in part, Denied, in part.

Sherry Ruggiero Fallon, Esquire, Wilmington, for Plaintiff.

James S. Yoder, Esquire, Wilmington, for Defendants.

OPINION

SILVERMAN, J.

*1 This case concerns whether a no-fault automobile insurance policy's personal injury protection, PIP, provisions cover in vitro fertilization, IVF. David Amundson was injured in a car accident and made claims against Liberty Mutual Fire Insurance Company for medical expenses under a Liberty Mutual policy's PIP coverage. Liberty Mutual seeks a declaratory judgment of its rights and remedies under its auto insurance contract. In response, the Amundsons move for summary judgment seeking the same relief, but in their favor.

I.

On February 4, 1998, David Amundson was a passenger in his wife's car. The car was involved in an accident and both Amundsons suffered severe injuries. Specifically, David's injuries included,

extensive blunt force injury to the torso with retroperitoneal hemorrhaging, a ruptured bladder, a ruptured urethra, lacerations of the spleen, lacerations of the liver, two fractured ribs, a fractured sacrum and a herniated disc in the lumbar spine.

Also, David suffers "obstructive azoospermia," a permanent condition rendering him unable to conceive through sexual intercourse. David's treating physicians attribute his condition to the auto accident.

A valid auto insurance contract between the Amundsons and Liberty Mutual existed when the accident occurred. The Policy had "First Party Benefit Coverage Limits of 50,000/100,000." Liberty Mutual applied $38,523.83 from the PIP policy's $50,000 limit for David's lost wages and medical expenses due to the accident. He has $11,476.17 PIP coverage remaining. Liberty Mutual applied $14,650.73 from the PIP policy's $50,000 limit for David's wife, Jhennifer. She has $35,349.27 remaining PIP coverage.

Within two years after the accident, from June 22, 1999 to October 7, 1999, the Amundsons successfully conceived using the IVF technique Intra Cytoplasmic Sperm Injection, ICSI.

The IVF process surgically removes an egg from the female's ovary and it is fertilized with the male's sperm outside the body. The fertilized egg is then placed in the female. ICSI, used by the Amundsons, is the latest technique. It uses a "more invasive sperm collection method" than IVF. So far, this is the first and only IVF/ICSI procedure they have

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 755375 (Del.Super.)
(Cite as: 2001 WL 755375 (Del.Super.))

undergone. Of the $18,528.13 IVF/ICSI expenses, the Amundsons paid $14,069.73 out-of-pocket, the balance was paid by their health carrier.

In their brief, the Amundsons note that the balance was paid "in that a portion of the first cycle of procedures was for making the initial diagnoses of David's infertility. [Co-Defendant health carrier] covered such diagnostic procedure expenses, but did not cover IVF costs." According to the Amundsons, within the two-year post-accident period, the Amundson's health care providers told Liberty Mutual that "additional cycles of ICSI/TESA-IVF surgeries and related treatments are medically necessary if the Amundsons are to have more children."

II.
A. Defendants' Contentions

As stated above, due to the accident, David Amundson cannot father a child without IVF. The Amundsons claim that their insurance PIP covers the procedure and their IVF medical expenses should be paid by Liberty Mutual. The Amundsons want Liberty Mutual to reimburse them for expenses from the first IVF procedure. Further, they want Liberty Mutual to "provide any PIP coverage remaining" to pay for any "IVF surgeries and related procedures" they may undergo in the future. They claim a right to the remaining PIP funds regardless of whether they are beyond the two-year window for PIP benefits.

B. Plaintiff's Contentions

*2 Liberty Mutual argues that it is not liable for IVF expenses. It maintains that under its insurance policy and 21 *Del. C.* § 2118(a)(2) it is "only required to compensate an insured for 'reasonable and necessary expenses incurred within two years from the date of the accident.' " Further, Liberty Mutual argues that Amundson's IVF medical expenses "are not 'reasonable and necessary expenses' resulting from prescribed medical treatment, but were merely for their comfort, convenience or other personal reasons."

III.

Under Delaware law, summary judgment motions require the Court to determine whether there are any genuine issues of material fact. [FN1] The Court must consider the facts in a light most favorable to the non-moving party [FN2] "accept[ing] as established all undisputed factual assertions, made by either party, and accept[ing] the non-movant's version of any disputed facts." [FN3] The moving party has the burden to present evidence demonstrating no issue of material fact. [FN4] If that burden is met, the non-moving party must show evidence demonstrating a genuine material issue of fact. [FN5] Summary judgment is granted only when no material issue of fact exists. [FN6]

FN1. *Moore v. Sizemore,* Del.Supr., 405 A.2d 679, 680 (1979).

FN2. *Merrill v. Crothall-American, Inc.,* Del.Supr., 606 A.2d 96, 99 (1992).

FN3. Id. at 99-100.

FN4. *Ebersole v. Lowengrub,* Del.Supr., 180 A.2d 467, 470 (1962).

FN5. Id.

FN6. *Merrill,* 606 A.2d at 99 (citing *Moore* ).

Delaware's Declaratory Judgment Statute, [FN7] provides a "means for securing judicial relief in an expeditious and comprehensive manner." [FN8] The statute is "entitled to a liberal application." [FN9] Additionally, four elements are required to consider a controversy for declaratory judgment:

FN7. 10 *Del. C.* § 6501-6513.

FN8. *Hoechst Celanese Corp. v. Nat'l Union Fire Ins. Co.,* Del.Super., 623 A.2d 1133 (1992) (citing *Stabler v. Ramsay,*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 755375 (Del.Super.)
(Cite as: 2001 WL 755375 (Del.Super.))

Del.Supr., 88 A.2d 546 (1952)). *See also Rollins Int'l Inc. v. Int'l Hydronics Corp.,* Del.Supr., 303 A.2d 660, 662-663 (1973) (citing *Marshall v. Hill,* Del.Supr., 93 A.2d 524 (1952)).

FN9. *Stabler,* 88 A.2d at 557.

(1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; (4) the issue involved in the controversy must be ripe for judicial determination. [FN10]

FN10. *Rollins Int'l Inc. v. Int'l Hydronics Corp.,* Del.Supr., 303 A.2d 660, 662-663 (1973) (citing *Marshall v. Hill,* Del. Supr., 93 A.2d 524 (1952)); *Hoechst, supra.*

The Delaware PIP statute, [FN11] also is construed liberally in favor of universal coverage, as a public policy goal. [FN12] Section (a)(2)a.1. provides:

FN11. 21 *Del. C.* § 2118.

FN12. *Morgan v. State Farm Mut. Auto. Ins. Co.,* Del.Supr., 402 A.2d 1211, 1215 (1979).

[c]ompensation to injured persons for reasonable and necessary expenses incurred within 2 years from the date of the accident for: 1. Medical, hospital, dental, surgical, medicine, x-ray, ambulance, prosthetic ... services. [FN13]

FN13. 21 *Del. C.* § 2118(a)(2)a.1..

The statute has two purposes. One, to ensure those injured receive, "the economic benefit of immediate payment without awaiting protracted litigation." [FN14] Two, "to impose on the no-fault carrier ...

not only primary but ultimate liability for the payment of [insured's] medical bills to the extent of [carrier's] unexpended PIP benefits." [FN15] Further, "[t]he primary objective of subsection[ ] (a)(2)a.... is to allow an insured to recover regardless of fault." [FN16] In summary, the law favors PIP coverage for reasonable and necessary expenses.

FN14. *United States Fidelity and Guar. Co. v. Neighbors,* Del.Supr., 421 A.2d 888, 890 (1980) (quoting *DeVincentis v. Maryland Cas. Co.,* Del.Super., 325 A.2d 610, 612 (1974).

FN15. *Int'l Underwriters, Inc. v. Blue Cross and Blue Shield of Delaware,* Del.Supr., 449 A.2d 197, 200 (1982).

FN16. *Bass v. Horizon Assurance Co.,* Del.Supr., 562 A.2d 1194, 1196 (1989); *Int'l Underwriters, Inc. v. Blue Cross and Blue Shield of Delaware,* Del.Supr., 449 A.2d 197, 199 (1982).

IV.

Other jurisdictions have addressed IVF issues in health insurance and ERISA [FN17] contexts, but those cases are few and unhelpful. Liberty Mutual relies on *Kinzie v. Physician's Liability Ins. Co.,* [FN18] but its reliance is misplaced. The plaintiff in *Kinzie* was naturally infertile. [FN19] Here, Amundson was rendered infertile due to the auto accident. As discussed below, the decision to undergo IVF may have been Amundson's, but the need for it was precipitated by the accident.

FN17. Employee Retirement Income Security Act.

FN18. Okla. Ct.App., 750 P.2d 1140 (1988).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 755375 (Del.Super.)
(Cite as: 2001 WL 755375 (Del.Super.))

FN19. Id. at 1141.

*3 The Amundsons also rely on cases from other jurisdictions. Those cases, too, are unhelpful since they involve the courts' interpreting "illness" under specific plans. [FN20] While the Court takes some comfort in the cases equating infertility with illness, those cases also are not controlling. Here, Amundson was injured in an auto accident, he was not subject to an "illness."

FN20. Egert v. Connecticut Gen. Life Ins. Co., 7th Cir., 900 F.2d 1032 (1990) (Because plan failed to define "illness," denial of plaintiff's IVF treatment was "arbitrary and capricious."); Witcraft v. Sundstrand Health and Disability Group Benefit Plan, Iowa Supr., 420 N.W.2d 785 (1988) (infertility was illness within meaning of plan, so related expenses were covered).

V.

It is indisputable that David Amundson was injured physically in the auto accident. His body was damaged. It is assumed here that before the accident, Amundson could have used his reproductive system to father children. Thanks to the accident, that no longer is possible without medical services.

The argument that IVF is elective misses the point. But for the accident, Amundson could have chosen to have children. After the accident he made the same decision, but to make it happen a medical procedure was necessary. Put another way, PIP serves as a partial substitute for tort litigation. While PIP coverage does not include general damages, it does cover specials. If Amundson were still allowed to sue the tortfeasor, there is in no way the other driver's insurance carrier could obtain summary judgment and shift the costs of IVF to Amundson or his health insurance on the ground that IVF is elective.

VI.

It follows that the expenses associated with Jhennifer's IVF also are covered. In order for David's IVF procedure to work, services must be provided to Jhennifer, too. The procedure, in part, is performed on Jhennifer, but the whole thing is necessary because of David's injury. Again, but for the accident, the Amundson's would not have had to pay for medical procedures in order to have children. The costs of IVF is part of the damage calculation.

VII.

Having decided that the Amundson's are entitled to PIP coverage for IVF, the extent of coverage must be considered. The PIP statute has specific limits. One limit concerns time. The law is clear that PIP covers two years. [FN21] While Liberty Mutual is bound to provide PIP for IVF during the PIP period, its obligation ends there. If the Amundsons incur IVF expenses after the PIP period has ended, that is between them, the tortfeasor and the Amundsons' health insurance carrier.

FN21. See 21 Del. C. § 2118(a)(2)a..

VIII.

For the foregoing reasons, Liberty Mutual must provide coverage under its policy for all of the Amundsons' IVF expenses incurred within two years of the accident up to the Policy's PIP limit. Upon submission, the court will enter an order denying Liberty Mutual's motion and granting the Amundsons' cross motion.

IT IS SO ORDERED.

2001 WL 755375 (Del.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H

Westlaw.

Not Reported in A.2d
2001 WL 50204 (Del.Ch.)
(Cite as: 2001 WL 50204 (Del.Ch.))

**H**
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT
RULES BEFORE CITING.

Court of Chancery of Delaware.

Patrick J. O'MALLEY and Leatha S. O'Malley on
behalf of themselves and all
others similarly situated, Plaintiffs,
v.
James R. BORIS, et al., Defendants.

No. Civ.A. 15735.

Submitted Nov. 14, 2000.
Decided Jan. 11, 2001.

William Prickett, Ronald A. Brown, Jr., Prickett,
Jones & Elliott, Wilmington, Delaware, Arthur T.
Susman, Charles, R. Watkins, John R. Wylie,
Susman & Watkins, Chicago, Illinois, for Plaintiffs,
of counsel.

Kevin R. Shannon, Brian C. Ralston, Potter
Anderson & Corroon LLP, Wilmington, Delaware,
Paul Gonson, Jeffrey B. Maletta, Stavroula E.
Lambrakopoulos, Christopher E. Dominguez,
Kirkpatrick & Lockhart LLP, Washington, D.C., for
Defendants Everen Capital Corporation, Everen
Securities Holdings, Inc., Everen Securities, Inc.,
Everen Clearing Corporation, Wheat First Butcher
Singer, Inc., Wheat First Securities, Inc., Mentor
Investment Group, Inc., and Mentor Investment
Group, L.L.C., of counsel.

*MEMORANDUM OPINION*

CHANDLER, J.

*1 The plaintiffs, Patrick J. and Leatha S.

O'Malley, have filed a motion for class certification
arising from their individual and class action claims
against eight defendants, Everen Securities
("Everen"), Everen Securities Holdings, Inc
("Everen Holdings"), Everen Capital Corporation,
Inc., Everen Clearing Corporation ("Everen
Clearing") (collectively, the "Everen Defendants")
as well as Mentor Investment Group, Inc.
("Mentor"), Mentor Wheat First Securities, Inc.,
and Wheat First Butcher Singer ("WFBS"), Inc.
(collectively, the "Mentor Defendants"), and
Mentor Investment Group L.L.C.

At the center of this dispute, the plaintiffs,
brokerage customers of Everen, argue that Everen
breached the fiduciary duties of loyalty and
disclosure to them in connection with a Joint
Venture Agreement (the "JVA") that called for the
transfer of Everen's clients' money market mutual
fund assets from funds managed by Zurich-Kemper
Investments to those managed by Mentor. Plaintiffs
object to Everen's receipt of an ownership interest
in the new money market fund provider. The
plaintiffs assert that the seven defendants besides
Everen induced, participated in, and aided and
abetted Everen's breaches of fiduciary duty.

The plaintiffs seek certification of a class of all
clients of Everen whose investments were
transferred by Everen from investment companies
managed by Zurich-Kemper Investments to
investment companies managed by the Mentor
Investment Group, or their successors in interest,
excluding defendants named herein. Plaintiffs also
seek to be named class representatives and to have
their attorneys named as class counsel. This is the
Court's decision on plaintiffs' motion.

I. FACTUAL AND PROCEDURAL
BACKGROUND

The facts of this case have been carefully
delineated by the earlier decisions of both the Court
of Chancery and the Supreme Court in this matter.
[FN1] A review of the basic facts as well as the
procedural history of this case remains important

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 50204 (Del.Ch.)
(Cite as: 2001 WL 50204 (Del.Ch.))

Page 2

for a complete understanding of the issues here presented.

> FN1. *See O'Malley v. Boris*, Del. Ch., C.A. No. 15735, Chandler C. (Jan. 19, 1999), *rev'd, O'Malley v. Boris*, Del.Supr., 742 A.2d 845, 851 (1999).

The plaintiffs, Patrick J. and Leatha S. O'Malley, are Illinois residents who are brokerage customers of Everen. Prior to November 1, 1996, Everen offered its customers the choice of having cash balances that would otherwise sit idle in brokerage accounts automatically invested in certain money market funds. In other words, the customers' cash is "swept" into "sweep accounts." [FN2]

> FN2. More specifically, "sweep accounts" are accounts in which dividends from investments and proceeds from investment sales, rather than sitting idle, are periodically "swept" into money market funds so that these funds can continue to earn income. Thus, for example, at the end of each business day, any excess funds that would otherwise not be invested would be automatically transferred into money market securities where they would earn interest.

On July 25, 1996, the Everen Defendants entered into the JVA with the Mentor Defendants. Under the JVA, Everen's parent company, Everen Holdings, would acquire a 20.2% ownership interest in the successor to Mentor, Mentor Investment Group L.L.C. (the "Venture"). WFBS would hold the remaining 79.8% interest in the Venture, subject to a contingent interest that allowed Everen Holdings to acquire up to a total of 50% of the Venture depending on the amount of assets invested in the Venture by clients of the Everen Defendants.

*2 By letter dated September 23, 1996 ("the Notification Letter"), Everen notified its customers that on November 1, 1996, it would automatically begin to transfer cash balances that had previously

been invested with Zurich-Kemper Investments to three Cash Resource Trust ("CRT") money market funds sponsored by Mentor (the "Mentor Funds"). The customers could opt-out of this arrangement by notifying Everen Clearing by October 25, 1996, that they did not want their assets to be transferred to the Mentor Funds. Along with the Notification Letter, Everen also included a prospectus for the Mentor Funds dated September 23, 1996 (the "Mentor Prospectus," or simply the "Prospectus"). The plaintiffs did not notify Everen Clearing of any objections to the proposed asset transfer. As a result, on November 1, 1996, Everen transferred the plaintiffs' assets to the Mentor Funds.

The O'Malleys assert that they would not have approved the transfer of their assets to the Mentor Funds had they known that Everen was using this transfer to acquire its interest in the Venture. The Supreme Court noted that neither the Notification Letter nor the Mentor Prospectus adequately explained how Everen acquired its interest in the Venture, that is, 20% of the Venture with an option to acquire as much as 50%. [FN3] The Notification Letter simply refers the reader to the attached Mentor Prospectus for information about its ownership interest in the Venture. The Mentor Prospectus states:

> FN3. *O'Malley v. Boris*, 742 A.2d at 847.

... [I]t is expected that promptly after [the] reorganization, EVEREN Securities, Inc. will acquire 20% of the outstanding shares of Mentor Investment Group. EVEREN may thereafter acquire additional shares in Mentor Investment Group (not to exceed an additional 30% of Mentor Investment Group's outstanding shares) depending principally on the amount of assets in investment companies sponsored by Mentor Investment Group or its affiliates (including the Funds) attributable to shares held by clients of EVEREN. [FN4]

> FN4. Am. Compl., Ex. C.

Additionally, the plaintiffs allege that Everen actually left them as well as the other members of

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 50204 (Del.Ch.)
(Cite as: 2001 WL 50204 (Del.Ch.))

their suggested class with little real choice but to participate. According to the Notification Letter, Everen clients who objected to the switch would be treated as follows:

> After notifying us, your C.F. [Kemper Money Market Funds] shares will then be re-registered in your own name and will not be held in your Everen account or listed on your Everen statement. Instead, you will receive money market fund statements directly from C.F., and *there will be no sweep* and/or check writing in connection with your Everen account. [FN5]

FN5. Am. Compl., Ex. B.

Thus, plaintiffs contend, any Everen clients who objected to the transfer of their funds to the Mentor Funds would be penalized because any dividends and proceeds from sales of investments would most likely sit idle rather than being swept into an interest bearing money market fund or other investment company security. In my previous consideration of this matter, I failed to grasp how these actions "penalized" the plaintiffs. Perhaps in the intervening period since that decision, the facts of the case have been further developed to provide some substance to this claim.

*3 The Amended Complaint asserts as the primary claim that Everen breached the fiduciary duties of loyalty and disclosure to its clients in connection with the transfer of sweep accounts to the Mentor Funds. The other claims presented by the Amended Complaint rest entirely on this first claim. In succinct terms, in the remaining claims, the plaintiffs contend that the Mentor Defendants and the other Everen Defendants induced or aided and abetted these breaches of fiduciary duty by Everen. Plaintiffs maintain that as a result of this alleged conduct, they are entitled to compensatory damages as well as a constructive trust over a portion of the Venture.

This Court previously dismissed all counts of the Amended Complaint for failure to state a claim. On appeal, the Supreme Court reversed that decision and remanded the matter. [FN6] In accordance with that Opinion, the plaintiffs filed the motion for class certification now before me.

FN6. *See supra* note 1.

## II. ANALYSIS ON A MOTION FOR CLASS CERTIFICATION

### A. Rule 23(a) Elements

Chancery Court Rule 23(a) requires a plaintiff to establish four elements in order to bring a class action:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. [FN7]

FN7. Ct. Ch. R. 23(a).

### B. The Uncontested Elements

Defendants do not contest plaintiffs have met their burden of proof with regard to the first two requirements of Rule 23(a), numerosity of class members, and common questions of law and fact. After reviewing plaintiffs' pleadings, I agree that Plaintiffs unequivocally satisfy the first two requirements of Rule 23(a).

### C. Do the O'Malleys Satisfy the Typicality Requirement?

Rule 23(a)(3) focuses on whether the claims or defenses of the class representatives fairly present the issues on behalf of the represented class. A representative's claim or defense will satisfy this element of Rule 23(a) if it arises from the same series of events or course of conduct that gives rise to the claims of other members of the class and is based on the same legal theory. [FN8] To satisfy this typicality requirement, "the legal and factual position of the class representative[s] must not be markedly different from that of the members of the class." [FN9]

FN8. *Leon H. Weiner & Assoc., Inc. v. Krapf,* Del.Supr., 584 A.2d 1220, 1226

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 50204 (Del.Ch.)
(Cite as: 2001 WL 50204 (Del.Ch.))

(1991)(quoting *Zeffiro v. First Pa. Banking & Trust Co.*, 96 F.R.D. 567, 569 (E.D.Pa.1983)).

FN9. *Leon H. Weiner & Assoc., Inc. v. Krapf*, 584 A.2d at 1225-26 (quoting *Singer v. Magnavox Co.*, Del. Ch., C.A. 4929, mem. op. at 3, Brown, V.C. (Dec. 14, 1978)).

Here, there is no material dispute between the parties that all of the members of the class, including the O'Malleys, maintained money market funds into which their Everen accounts were swept and that Everen owed the same fiduciary duties to each of these clients. Everen's actions in connection with the JVA affected each of the potential class members in the same way and all class members, including the O'Malleys, have identical claims and remedies against the defendants.

Defendants instead contend that the O'Malleys are inappropriate class representatives because they are subject to defenses that differentiate them from the other potential class members. [FN10] Specifically, defendants argue that: (a) Patrick O'Malley's deposition testimony makes clear that the terms of the JVA were immaterial to him and he was indifferent to the defendants' plans to switch his money market mutual fund assets at the time of the first transfer; (b) the O'Malleys would not have been mislead even had they read the Mentor Prospectus because their reading of the Prospectus, as evidenced by Dr. O'Malley's deposition testimony, is contrary to the allegations of the Amended Complaint; and, (c) by keeping their accounts at Everen after the switch of their assets to the Mentor Funds, the O'Malleys have acquiesced to and ratified the defendants' allegedly wrongful conduct.

FN10. *See Zimmerman v. Home Shopping Network, Inc.*, Del. Ch., C.A. Nos. 10911 & 10919, Jacobs, V.C. (Aug. 14, 1990, revised Aug. 30, 1990); *Harman v. Masoneilan Int'l, Inc.*, Del. Ch., C.A. No. 5935, Longobardi, V.C. (Oct. 26, 1983)(Order). *See also* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and*

*Commercial Practice in the Delaware Court of Chancery* § 9-3(b)(1)(iii), at 624 (1998).

*4 Court of Chancery Rule 23 is modeled substantially on Rule 23 of the Federal Rules of Civil Procedure. This Court, therefore, often looks to federal decisions interpreting that rule for precedent that may help to construe and apply its Court of Chancery counterpart. [FN11] There is some precedent in the Court of Chancery where parties have opposed class certification on the ground that the named plaintiff is subject to unique defenses. [FN12] The precedent is more developed though at the federal level where numerous courts have held that the existence of unique defenses can destroy typicality. [FN13] Many federal courts, however, have also persuasively written that the existence of unique defenses do not necessarily render the claims of a specific plaintiff atypical of the larger class. [FN14] The United States District Court for the Eastern District of Pennsylvania has written:

FN11. Federal Rules of Civil Procedure, Rule 23. *See, e.g., Leon H. Weiner & Assoc., Inc v. Krapf*, 584 A.2d at 1224.

FN12. *See, e.g., Dieter v. Prime Computer, Inc.*, Del. Ch., 681 A .2d 1068 (1996); *Zimmerman v. Home Shopping Network, Inc.*, Del. Ch., C.A. Nos. 10911 & 10919, Jacobs, V.C. (Aug. 14, 1990, revised Aug. 30, 1990); *see generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 9-3(b)(1)(iii), at 624 (1998).

FN13. *See, e.g., Fleck v. Cablevision VII, Inc.*, 763 F.Supp. 622, 625-27 (D.D.C.1991)("A claim is not typical when the representative parties are subject to unique defenses or when it is predictable that a major focus of the litigation will be on an arguable defense unique to the named plaintiff."); *Wagner v. Lehman*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 50204 (Del.Ch.)
(Cite as: 2001 WL 50204 (Del.Ch.))

*Bros. Kuhn Loeb Inc.,* 646 F.Supp. 643, 660 (N.D.Ill.1986)("It is enough to deny class treatment when a defense peculiar to the class representative is even arguably present.")

FN14. *See, e.g., Mersay v. First Republic Corp. of America,* 43 F . R.D. 465, 469 (S.D.N.Y.1969)("If [plaintiff] were required to prove his own reliance or damage at this stage, it would follow that no class action could stand until the plaintiff proved every material element of his individual claim. Clearly, such a procedure was not envisioned under Rule 23.")

The defendants' contention that the existence of a unique defense renders a representative's claim atypical has been rejected where the overriding question common to the class is "logically prior" to special defenses against the named plaintiff.... Where, as here, an alleged defense may affect the individual's ultimate right to recover, but it does not affect the presentation of the case on the liability issues for the plaintiff class, that defense should not make a plaintiff's claim atypical. [FN15]

FN15. *Zeffiro v. First Pennsylvania Banking & Trust Co.,* 96 F.R.D. 567, 570 (E.D.Pa.1983) (citations omitted).

I find this "logically prior" reasoning quite persuasive as it pertains to the first two atypicality arguments put forth by the defendants.

First, the defendants argue that plaintiffs are not typical of the members of the proposed class because Dr. O'Malley was indifferent to the transfer of his money market mutual fund assets as evidenced by the fact that he did not read the portion of the Prospectus dealing with Everen's acquisition of the interest in the Venture. Therefore, the defendants assert that the alleged omissions could not have been material to the O'Malleys. Second, the defendants assert that the O'Malleys would not have been mislead even had they read the Mentor Prospectus because their reading of the

Prospectus, as evidenced by Dr. O'Malley's deposition testimony, is contrary to the allegations of the Amended Complaint. These arguments rest on questions of materiality and reliance. The overriding questions common to the class, however, are whether Everen breached its fiduciary duties of loyalty and disclosure by agreeing to enter into the JVA for its own benefit and whether Everen made the proper disclosures upon entering the JVA. These questions are "logically prior" to this first special defense asserted against the named plaintiff. Questions of reliance and materiality, in keeping with the logic expressed in *Zeffiro,* do not affect the presentation of the case on the liability issues for the proposed plaintiff class. [FN16] Although these special defenses may eventually weigh heavily towards the defendants in preventing any compensatory recovery by these named plaintiffs, they do not render the named plaintiffs atypical within the proposed class. [FN17]

FN16. *Id.*

FN17. I leave the issue of what role reliance and materiality may play within this breach of fiduciary duty case to another day. For now, it is enough to hold that these defenses do not render the plaintiffs atypical.

*5 Third, the defendants contend that the O'Malleys have made themselves atypical by keeping their accounts at Everen even after the switch of their assets to the Mentor Funds. This argument is clearly without merit. The proposed class consists of all clients of Everen whose investments were transferred by Everen from investment companies managed by Zurich-Kemper Investments to investment companies managed by Mentor. That class includes persons who continue to do business with Everen as well as persons who have decided for whatever reason to no longer do business with Everen. Both groups have a damage claim, to the extent that these claims succeed on their merits. [FN18] I therefore find that the plaintiffs satisfy the typicality requirement of Rule 23(a)(3).

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 50204 (Del.Ch.)
(Cite as: 2001 WL 50204 (Del.Ch.))

Page 6

FN18. *See Zimmerman v. Home Shopping Network, Inc.*, C.A. Nos. 10911 & 10919, mem. op. at 13, Jacobs, V.C. (Aug. 14, 1990, *revised* Aug. 30, 1990).

*D. Are the O'Malleys Adequate Representatives?*

Court of Chancery Rule 23(a)(4) requires that "the representative parties fairly and adequately protect the interests of the class." [FN19] As I have previously written,

FN19. Ct. Ch. R. 23(a)(4).

in order to meet the adequacy requirements of Rules 23 or 23.1, a representative plaintiff must not hold interests antagonistic to the class, retain competent and experienced counsel to act on behalf of the class and, finally, possess a basic familiarity with the facts and issues involved in the lawsuit. [FN20]

FN20. *In re Fuqua Industries, Inc. Shareholder Litigation*, Del. Ch., 752 A.2d 126, 127 (1999).

The defendants do not allege that the O'Malleys have interests antagonistic to the class or that plaintiffs' counsel is in any way incompetent or inexperienced. Rather, defendants argue that Dr. and Mrs. O'Malley lack some of the basic qualifications necessary to act as representatives of the proposed class and that their lawyers, not the named plaintiffs themselves, are the driving force behind this litigation.

Leaving a more detailed discussion to another day, it is fair to say (as even the defendants concede) that the requirements for an "adequate" class representative are not onerous. [FN21] In certain instances, a named plaintiff's understanding and control of the litigation has been held to be largely insignificant. [FN22] It is a well-settled legal principle that class representatives are not required to fully understand the nuances of the legal theories underlying each of their claims. [FN23] Plainly, a rudimentary understanding of the claims, facts, and issues is adequate.

FN21. Def. Answering Br., at 28. For a more thorough discussion, *see In re Fuqua Industries, Inc. Shareholder Litigation*, 752 A.2d at 129-34.

FN22. *See, e.g., Surowitz v. Hilton Hotels Corp.*, 383 U.S. 363, 86 S.Ct. 845 (1966); *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239 (3d Cir.1975), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415 (1975); *Lewis v. Curtis*, 671 F.2d 779 (3d Cir.1982).

FN23. *Shapiro v. Nu-West Industries, Inc.*, C.A. No. 15442, slip op. at 6, Chandler, C. (Sept. 29, 2000).

Presently, the O'Malleys do not claim to understand each of the nuances of their claims. Yet it is clear from their deposition testimony that both Dr. and Mrs. O'Malley understand the nature of the claims, the alleged wrongdoing of the defendants, and the basic facts and issues raised by this lawsuit. Further, even if the lawyers are the driving force behind the litigation, that is not reason enough to convince this Court that the O'Malleys are inadequate representatives. As I have previously noted:

Our legal system has long recognized that lawyers take a dominant role in prosecuting litigation on behalf of clients. A conscientious lawyer should indeed take a leadership role and thrust herself to the fore of a lawsuit. This maxim is particularly relevant in cases involving fairly abstruse issues of corporate governance and fiduciary duties. [FN24]

FN24. *In re Fuqua Industries, Inc. Shareholder Litigation*, 752 A.2d at 132.

*6 That is clearly the case here.

Further, in regard to Mrs. O'Malley specifically, the fact that she relied on her husband to be the primary handler of their financial matters does not disqualify her to act as a class representative. In *Iseman v. Liquid Air Corp.*, this Court found a representative adequate despite the fact she knew little about the

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 50204 (Del.Ch.)
(Cite as: 2001 WL 50204 (Del.Ch.))

litigation but had always received investment advice and assistance from her son who was also a party. [FN25] Similarly, Mrs. O'Malley, who has clearly relied on her husband to make investment decisions, is an adequate representative where her husband is also a party to the claim. The requirements of Rule 23(a)(4) are therefore satisfied for both Dr. and Mrs. O'Malley.

FN25. *See Iseman v. Liquid Air Corp.,* Del. Ch., C.A. No. 9694, Berger, V.C. (Feb. 11, 1993).

*E. Rule 23(b) Elements on a Motion for Class Certification*

Once the plaintiff establishes the elements of Rule 23(a), this Court must determine whether to maintain the class action under Rule 23(b). To maintain the class action this Court must find:
(1) The prosecution of separate actions by or against individual members of the class would create a risk of:
(A) Inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
(B) Adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
(1) The party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
(2) The Court finds that the question of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matter pertinent to the findings include:
(A) The interest of members of the class in individually controlling the prosecution or defense of separate actions;
(B) The extent and nature of any litigation

concerning the controversy already commenced by or against members of the class;
(C) The desirability or undesirability of concentrating the litigation of the claims in the particular forum;
(D) The difficulties likely to be encountered in the management of a class action. [FN26]

FN26. Ct. Ch. R. 23(b).

A plaintiff has the burden of satisfying the Court it has met the requirements of Rule 23. [FN27]

FN27. *Dieter v. Prime Computer,* Del. Ch., 681 A.2d 1068 (1996).

*F. Is Class Certification Appropriate Under 23(b)?*

The Rule 23(b)(1) class designation deals with the possibility of separate adjudications. [FN28] A 23(b)(1)(A) class designation focuses on the risks faced by the defendants while a 23(b)(1)(B) class designation concentrates on the risks confronting members of the prospective class. [FN29] For a class to be certified under 23(b)(1)(A), there must be a realistic likelihood of multiple litigation and a total absence of individual issues among the class. [FN30] Here, given the extended history of this case and the fact that the events complained of occurred over four years ago yet the lack of concurrent related litigations before this or any other court, the probability for multiple litigations seems small. This is purely conjectural evidence though, and by itself, would not be enough to defeat class certification under 23(b)(1)(A). There will, however, plainly be factual and legal issues concerning issues such as reliance and materiality, discussed above, that shall affect individual members of the class. The application of 23(b)(1)(A) is therefore inappropriate here.

FN28. *Joseph v. Shell Oil Co.,* Del. Ch., C.A. No. 7450, mem. op. at 4, Hartnett, V.C. (Feb. 8, 1985).

FN29. *Id.*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 50204 (Del.Ch.)
(Cite as: 2001 WL 50204 (Del.Ch.))

Page 8

FN30. *PaineWebber R & D Partners II, L.P. v. Centocor, Inc.,* Del. Ch., C.A. 14405, mem. op. at 15, Steele, V.C. (Mar. 15, 1995).

*7 Rule 23(b)(1)(B) permits the certification of a proposed class where the risk that adjudication of a single shareholder's claim may have *res judicata* effect on the claims of other absent shareholders. [FN31] In situations where class certification is appropriate under 23(b)(1)(B), the claims of absent shareholders would be prejudiced if the claim is not certified. [FN32] This is the case here where any potential suit brought by any other individual member of this proposed class would necessarily depend on the factual and legal conclusions made by the Court in this matter surrounding the JVA and the conduct of the defendants. If this Court were to decide that Everen did not breach its fiduciary duties of loyalty and disclosure, that would effectively preclude any other potential plaintiffs from pursuing their own claims against Everen. In a recent decision, this Court certified a class under Rule 23(b)(1)(B) under a similar set of circumstances. In *Shapiro v. Nu-West Industries,* the complaint at the time of the decision included a single count in which former holders of Class A preferred stock sought damages alleging that Nu-West improperly calculated the redemption price for the Class A stock pursuant to Nu-West's certificate of incorporation. [FN33] In certifying the class in that case, this Court noted:

FN31. *Wacht v. Continental Hosts, Ltd.,* Del. Ch., C.A. No. 7954, mem. op. at 10, Chandler, C. (Sept. 16, 1994), *modified on other grounds,* Del. Ch., C.A. No. 7954, Chandler, C. (Dec. 23, 1994).

FN32. *Id.*

FN33. C.A. No. 15442, slip op. at 1-2, Chandler, C. (Sept. 29, 2000).

If this Court agrees with defendants that Nu-West's certificate precludes daily accrual of dividends during 1996, this determination would

effectively preclude holders of Class A preferred stock who are not parties to this action from pressing claims that they are entitled to payment of dividends for 1996. [FN34]

FN34. *Id.* at 7.

This same conclusion applies to the present case as well.

Additionally, I would note that it may be appropriate to certify a class under 23(b)(1)(B) even where the claims presented by the plaintiffs are solely for monetary damages. [FN35] Here, plaintiffs' request for monetary damages as well as equitable damages in the form of a constructive trust placed over a portion of the Mentor Funds, regardless of the merits of that request, in no way prevents me from certifying this class under 23(b)(1)(B).

FN35. *See Wacht v. Continental Hosts, Ltd.,* C.A No. 7954, mem. op. at 10; *Turner v. Bernstein,* Del. Ch., C.A. No. 16190, mem. op. at 5, Strine, V.C. (Aug. 11, 2000).

Rule 23(b)(2) class certification is not appropriate where the plaintiff is seeking primarily monetary relief. [FN36] Rather, Rule 23(b)(2) certification is generally reserved for cases in which the relief sought is primarily classwide injunctive or declaratory relief. [FN37] Although the plaintiffs have asked for a constructive trust, this relief is neither the "thrust" of this litigation nor the likely result of this litigation should the plaintiffs prevail. [FN38] A constructive trust is an appropriate remedy where, in its absence, an injustice would be inflicted upon the plaintiffs. [FN39] Without reaching the merits of the claims in this matter, the Court notes that the granting of a constructive trust here would be quite exceptional. More likely, if plaintiffs are to ultimately recover any damages whatsoever in this action, they would almost assuredly be strictly compensatory monetary damages. For these reasons, class certification under 23(b)(2) would be inappropriate.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2001 WL 50204 (Del.Ch.)
(Cite as: 2001 WL 50204 (Del.Ch.))

FN36. *Wacht v. Continental Hosts, Ltd.,*
C.A No. 7954, mem. op. at 9.

FN37. *Nottingham Partners v. Dana,*
Del.Supr., 564 A.2d 1089 (1989).

FN38. *See Dieter v. Prime Computer,* 681
A.2d at 1075.

FN39. *Richetti v. Sanzo,* Del. Ch., C.A.
No. 11760, mem. op. at 13, Chandler, V.C.
(Jan. 5, 1994).

*8 The Court also notes, however, that the
proposed class could alternatively be certified under
Rule 23(b)(3). Clearly in this matter, common
issues of fact and law lay at the core of this action
and predominate over any questions affecting only
individual class members. Additionally, the class
action mechanism provides this Court, with its
limited judicial time and resources, with the most
fair and efficient course of action to deal with this
controversy.

### III. CONCLUSION

I grant plaintiff's motion for class certification and
hereby designate that class to consist of all clients
of Everen whose investments were transferred
pursuant to the JVA by Everen from investment
companies managed by Zurich-Kemper Investments
to investment companies managed by the Mentor
Investment Group, or their successors in interest,
excluding defendants named herein.

I also conclude that plaintiffs Patrick and Leatha
O'Malley have asserted claims typical of all class
members and will serve as adequate class
representatives. Plaintiffs' attorneys are also hereby
appointed as class counsel.

Counsel should confer and submit an appropriate
Class Certification Order.

2001 WL 50204 (Del.Ch.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I

Westlaw.

Not Reported in A.2d
2003 WL 22290906 (Del.Super.)
(Cite as: 2003 WL 22290906 (Del.Super.))

Page 1

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware.

Sherri L. WATSON
v.
METROPOLITAN PROPERTY & CASUALTY INSURANCE COMPANY

No. Civ.A.02C05261RRC.

Submitted Sept. 12, 2003.
Decided Oct. 2, 2003.

On Defendant's Motion for Partial Summary Judgment. Granted in Part, Denied in Part.

On Defendant's Motion in Limine. Denied in Part, Deferred in Part.

On Plaintiff's Application to Prohibit Defendant's Expert from Offering Testimony. Deferred.

L. Vincent Ramunno, David R. Scerba, Ramunno, Ramunno & Scerba, P .A., Wilmington, Delaware, for Plaintiff.

Norman H. Brooks, Jr., Megan T. Mantzavinos, Deborah E. Allen, Marks, O'Neill, O'Brien & Courtney, P.C., Wilmington, Delaware, for Defendant.

Dear Counsel:

COOCH, J.

*1 Plaintiff filed suit to recover medical expenses stemming from an automobile accident that Defendant refused to pay on the ground that the amounts billed were excessive. Plaintiff also averred that this refusal was unreasonable and in "bad faith," and she requested punitive damages and attorneys' fees. Defendant filed a Motion for Partial Summary Judgment on these three issues, asserting that the "reasonableness" of medical expenses under Delaware's no-fault statute is to be determined by the medical provider and the insurance company (and that Plaintiff has failed to proffer evidence establishing such "reasonableness"), that Plaintiff has failed to demonstrate that Defendant had acted in bad faith because Plaintiff has taken no discovery on this issue (and therefore punitive damages cannot be recovered), and that there is no basis by statute or by contract to award to Plaintiff her attorneys' fees.

Because this Court cannot now rule that the complained-of bills rendered by Dr. Ross Ufberg in his treatment of Plaintiff were not "reasonable" in amount (a determination to be made by the finder of fact) and because the finder of fact must determine whether Dr. Ufberg can support the "reasonableness" of those amounts (which testimony this Court will permit to be introduced at trial), Defendant's Motion for Partial Summary Judgment is hereby DENIED IN PART and that portion of Defendant's Motion in Limine which seeks to bar Dr. Ufberg from testifying at trial must likewise be DENIED. (The Court will not now act on the portion of the Motion in Limine which seeks to bar Dr. James Fusco from testifying at trial; accordingly, the Motion in Limine is also DEFERRED IN PART.) However, as to those portions of Defendant's Motion for Partial Summary Judgment which seek to preclude an assertion of "bad faith" and to preclude an award of attorneys' fees in Plaintiff's favor, the Court largely agrees with the positions advanced by Defendant, and accordingly, those portions of the Motion for Partial Summary Judgment are GRANTED.

*FACTUAL AND PROCEDURAL HISTORY*

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 22290906 (Del.Super.)
(Cite as: 2003 WL 22290906 (Del.Super.))

Page 2

Plaintiff, an occupant of an automobile involved in an accident on January 8, 2001, sustained compensable injury. Following the accident, Plaintiff treated with Dr. Ross Ufberg and with Dr. James Fusco. Defendant provided no-fault benefits to Plaintiff pursuant to title 21, section 2118 of the Delaware Code. [FN1] However, following an independent medical exam of Plaintiff conducted at Defendant's request, Defendant discontinued payments for any additional medical treatment to Plaintiff.

> FN1. Section 2118(a)(2) provides, in pertinent part, that a vehicle owner must carry insurance to pay "[c]ompensation to injured persons for reasonable and necessary [medical] expenses incurred within [two] years from the date of the accident...."

Prior to the discontinuance of her no-fault benefits, Plaintiff's bills from Dr. Ufberg totaled $495. Of that amount, Defendant paid Dr. Ufberg $328.10, leaving a balance of $166.90, presumably for Plaintiff herself to pay. [FN2] Defendant paid these lesser amounts to Dr. Ufberg based on its purported assessment of similar medical provider charges "within th[is] provider's geographic region." [FN3] Plaintiff saw Dr. Ufberg two additional times following the independent medical exam, each time being charged $105 (for a total of $210); [FN4] this $210 amount apparently remains unpaid, so Dr. Ufberg's unpaid bills total $376.90.

> FN2. See Ex. "1(A)" to Pl.'s Resp. to Def.'s Mot.

> FN3. See Exs. "B" and "C" to Def.'s Mot.

> FN4. Ex. "1(A)" to Pl.'s Resp. to Def.'s Mot.

*2 In May 2002 Plaintiff filed suit to recover "unpaid medical expenses and/or loss of wages, plus any additional expenses and/or losses to be incurred in the future...." [FN5] (Plaintiff has since represented that in addition to the amounts billed by Dr. Ufberg, Dr. Fusco is owed $2,177, and "Spinal Imaging" is owed $390 for x-rays.) [FN6] Plaintiff additionally averred that Defendant's "refusal to honor its insurance policy and pay the no-fault benefits to the extent of its coverage ... [wa]s unreasonable ... and in bad faith ... and ha[d] caused ... consequential losses and mental anguish." [FN7] Plaintiff requested a jury trial and demanded judgment against the Defendant "for compensatory and punitive damages, consequential damages, and attorneys' fees." [FN8]

> FN5. Compl. ¶ 7.

> FN6. Pl.'s Resp. to Def.'s Mot. at 1.

> FN7. Compl. ¶ 9.

> FN8. Compl. at 2.

In its Answer to the Complaint, Defendant admitted that Plaintiff "received certain injuries and treatment in connection with the ... auto accident []" [FN9] but averred that "Plaintiff fail[ed] to state the nature of the claim other than [in] a generic ... [manner]." [FN10] Defendant denied that its actions were undertaken in "bad faith," and stated as an affirmative defense that Plaintiff's Complaint "fail[ed] to state a claim for punitive damages." [FN11] Defendant also requested a jury trial.

> FN9. Answer ¶ 4.

> FN10. Id. ¶ 5.

> FN11. Id. ¶ 10.

The docket indicates that in terms of discovery, Plaintiff so far has propounded a single set of interrogatories and a single request for production

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 22290906 (Del.Super.)
(Cite as: 2003 WL 22290906 (Del.Super.))

of documents upon Defendant. The discovery cut-off date has passed. Despite the establishment of both "expert" and "fact" discovery deadlines, it does not appear that Plaintiff conducted any other discovery prior to the dispositive motion deadline in this case. By letter dated July 3, 2003 (four days before Defendant's expert witness cutoff deadline), however, counsel for Defendant indicated to counsel for Plaintiff that Defendant had retained an expert "in the area of hospital and physician medical expense coding[ ]" and that in that expert's opinion, "based upon data collected in th[e] geographical area[,]" was that Defendant had paid "all reasonable and necessary charges imposed by ... Dr. Ufberg." [FN12]

FN12. Letter from Norman H. Brooks, Jr. to L. Vincent Ramunno of 7/3/03, at 1 (Ex. "3" to Pl.'s Resp. to Def.'s Mot.). By letter dated September 8, 2003, counsel for Plaintiff has indicated that Plaintiff objects to this expert giving testimony on the ground that "the basis for her testimony is not sufficiently set forth so as to enable preparation of an effective cross[-]examination of her...." Letter from David R. Scerba to the Court of 9/8/03, at 1 (Dkt.# 28). In its Reply in support of its Motion in Limine, Defendant contends that its "coding" expert based her opinion "upon data collected for each CPT code in this particular geographical area." Def.'s Reply ¶ 2a. This matter will be taken up, if necessary, at trial (in order to allow for further in-court voir dire outside of the presence of the jury to additionally explore the witness's expertise); the Court notes, however, that Defendant's "coding" expert was timely identified, and that counsel for Plaintiff apparently did not depose her prior to the close of all discovery in this matter.

Defendant thereafter filed the instant motion, through which it moves for an order of partial summary judgment "as to the [un]reasonableness of ... [Dr. Ufberg]'s charges and/or Plaintiff's standing to litigate that issue[ ][,] as to Plaintiff's bad faith claim[ ][,] and as to Plaintiff's claims for punitive

damages and attorney's fees." [FN13] A two-day trial is scheduled for October 8, 2003.

FN13. Def.'s Mot. at 4.

*CONTENTIONS OF THE PARTIES*

Defendant's preliminary argument in its Motion for Partial Summary Judgment is that "[t]he issue of whether a medical expense is reasonable is an issue properly left to resolution by the ... [insurer] and the [medical] provider [ ]"; Defendant therefore contends that Plaintiff "lacks standing to maintain an action against ... [it] over the reasonableness of the fees charged by the doctors who treated her." [FN14] Defendant alternatively argues that summary judgment in its favor should be granted because Plaintiff "has proffered no evidence that the amounts charged by ... [Dr. Ufberg] are reasonable." [FN15]

FN14. Def.'s Mot. ¶ 9.

FN15. *Id.* ¶ 10.

*3 Defendant maintains that "[t]he affidavit of Dr. Ufberg [attached to Plaintiff's Response and purportedly establishing the "reasonableness" of his fees] speaks for itself in that it is nothing more than a conclusory statement" [FN16] which is "insufficient as a matter of law[ ]"; [FN17] Defendant contends that Plaintiff therefore "fails to satisfy her burden of proof on the issue" and that it is correspondingly entitled to judgment as a matter of law." [FN18] Defendant cites *Anticaglia v. Lynch* [FN19] in support of that last proposition.

FN16. Def.'s Reply ¶ 3.

FN17. *Id.* ¶ 4.

FN18. *Id.* ¶ 7.

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 22290906 (Del.Super.)
(Cite as: 2003 WL 22290906 (Del.Super.))

FN19. C.A. No. 90C-11-175, 1992 WL 138983, at *6-*7 (Del.Super.Ct. Mar. 16, 1992) (holding that the determination of a "reasonable" and "customary" fee is entirely factual in nature, and that the medical provider testifying on behalf of the reasonableness of his billing in that case had provided "no reliable proof" of the customary and reasonable fees to be expected because he alone testified to their reasonableness).

With regard to Plaintiff's "bad faith" claim, Defendant argues in its Motion for Partial Summary Judgment that "there is simply no evidence that ... [it]'s actions were 'clearly without any justification,' as is required to establish bad faith[ ]"; [FN20] in support, Defendant cites *Casson v. Nationwide Insurance Co.*. [FN21] Defendant highlights that Plaintiff "has taken no depositions in th[is] case[ ]" and that she "has pursued no discovery in furtherance of her allegation...." [FN22] Defendant posits that because "there exist[s] no record evidence tending to support [P]laintiff's allegation" it is "entitled to judgment as a matter of law on plaintiff's claim for bad faith...." [FN23]

FN20. Def.'s Mot. ¶ 14.

FN21. 455 A.2d 361, 369 (Del.1982) (formulating that standard in response to the plaintiff's argument that an insured's "bad faith" refusal to make payments due under an insurance contract breached an "implied duty to deal fairly and in good faith with an insured").

FN22. Def.'s Reply ¶ 10.

FN23. *Id.* ¶ 12.

Defendant similarly contends in its Motion for Partial Summary Judgment that Plaintiff's claims for punitive damages and attorneys' fees "have no basis, and should be dismissed[ ][,]" [FN24] and it again

cites to *Casson* for support of its proposition. [FN25] Defendant contends that "[i]n an action at law, a court may not order payment of attorney's fees ... unless ... authorized by some provision of statute or contract[ ]"; [FN26] Defendant states that there is no such provision in the policy at issue, and again cites *Casson* for the proposition that "there is ... [no] statutory authorization for [such] an award ... in a suit for no-fault benefits...." [FN27]

FN24. Def.'s Mot. ¶ 15

FN25. *See Casson*, 455 A.2d at 368 (stating that "given a proper set of circumstances," Delaware courts "would authorize recovery of punitive damages in egregious cases of willful or malicious breach of contract[ ]" but that "[a]n assertion of malice without factual basis is insufficient[ ]").

FN26. Def.'s Mot. ¶ 16.

FN27. *See Casson*, 455 A.2d at 370 (stating after refuting the plaintiff's argument that the insurer's conduct therein fell within Delaware's Prohibited Trade Practices Act that "there is no statutory basis for an award of attorney's fees in this [no-fault] case[ ]").

Lastly, Defendant contends in its Motion in Limine that "[n]either Dr. Ufberg's affidavit nor any other evidence proffered by Plaintiff offers any credible data or other basis or method commonly accepted by scientists, physicians or economists which would support Dr. Ufberg's conclusory statement at to the reasonableness of his fees when compared to those charged by other physicians similarly situated in the area." [FN28] Because Defendant contends that such evidence does not satisfy either Delaware Rule of Evidence 702 [FN29] or the *Anticaglia* case, it argues that "Dr. Ufberg's testimony in this regard is merely the product of his own belief or speculation, and must [therefore] be precluded from ... trial." [FN30]

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 22290906 (Del.Super.)
(Cite as: 2003 WL 22290906 (Del.Super.))

FN28. Def.'s Mot. in Limine ¶ 14 (Dkt.# 21). Again, the Motion in Limine also seeks to prohibit Dr. Fusco from testifying at trial on similar grounds, an argument which this Court will not now decide.

FN29. Rule 702 provides a three-part test for the admission of "expert" testimony.

FN30. Def.'s Mot. in Limine ¶ 14.

In response to Defendant's preliminary argument regarding her standing, Plaintiff puts forward that "Defendant's ... [contention] is frivolous, absurd, and reflect[s] clearly upon Defendant's bad faith...." [FN31] Plaintiff (correctly) argues that Defendant "offers absolutely no authority for the proposition that it seeks to advance ... [regarding Plaintiff's standing]." [FN32] With regard to Defendant's substantive argument concerning the reasonableness of Dr. Ufberg's billings, Plaintiff responds by attaching an affidavit executed by the doctor stating that "the specific charges assessed are reasonable ... and are wholly consistent with what is usually and customarily charged in this medical community ..."; [FN33] Plaintiff therefore declares that "questions of 'reasonableness' are commonly left for the jury to decide...." [FN34] In fact, Plaintiff contends that "if forced to trial ... [she] will present the single question of whether Plaintiff's bills meet the statutory threshold for compensability, i.e., whether they are reasonable, necessary and causally related to the subject accident." [FN35]

FN31. Pl.'s Resp. to Def.'s Mot. ¶ 1.

FN32. Id.

FN33. Ross Ufberg Aff. ¶ 4 (Ex. "I" to Pl.'s Resp. to Def.'s Mot .).

FN34. Pl.'s Resp. to Def.'s Mot. ¶ 2.

FN35. Letter from L. Vincent Ramunno to the Court of 8/6/03, at 1.

*4 Plaintiff further advances that "[n]othing in the [no-fault] statute or the case law requires an insured to submit documentation along with ... medical bills to establish that ... charges [we]re reasonable." [FN36] Plaintiff contends that "[u]nder these circumstances, Dr. Ufberg's [a]ffidavit ... [i]s a timely rebuttal to the final hour assertion of a defense and the listing of a new "expert" [in Mr. Brooks's July 3, 2003 letter to Plaintiff's counsel] ... despite ample time and opportunity to ... [previously disclose that information]." [FN37]

FN36. Pl.'s Resp. to Def.'s Mot. ¶ 5.

FN37. Id.

With regard to punitive damages, Plaintiff argues that her claim "is genuine." [FN38] In support, Plaintiff contends that "the Defendant's position in refusing to pay the bills of Dr. Ufberg is clearly without justification, thus entitling Plaintiff to an award of punitive damages [ ]"; [FN39] like Defendant, Plaintiff cites to Casson to support her argument. [FN40]

FN38. Id. ¶ 4.

FN39. Id.

FN40. See Casson, 455 A.2d at 369 (stating that, with regard to the test of whether "any reasonable justification" existed for an insurer to refuse to honor its contractual obligation, "[t]he ultimate question is whether at the time the insurer denied liability, there existed a set of facts or circumstances known to the insurer which created a bona fide dispute and therefore a meritorious defense to the insurer's liability[ ]").

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 22290906 (Del.Super.)
(Cite as: 2003 WL 22290906 (Del.Super.))

In response to Defendant's Motion in Limine, Plaintiff argues that she does have sufficient evidence to establish the "reasonableness" of Dr. Ufberg's charges, in that:

> If ... permitted to testify, [Dr. Ufberg] would say that he is a state-licensed physician, who has owned and operated his own medical facility specializing in the treatment of the same type of injuries sustained by [Plaintiff] since 1985; that he is familiar with his billing practices and his charges since he in fact established them; that these charges are the very same charges paid by the majority of insurance companies with which he deals, as well as self[-]insureds, everyday in his practice; that he is aware generally of what other facilities in the local community charge for services similar to his own; that his charges are in no event excessive or unreasonably higher than those charged elsewhere as evidenced by the fact that they are paid in full by the majority of insurance companies with which he deals. [FN41]

FN41. Pl.'s Resp. to Def.'s Mot. in Limine ¶ 2 (Dkt.# 23).

Plaintiff therefore construes *Anticaglia* in her favor as, according to Plaintiff, the judge deciding that matter "did not preclude Dr. Anticaglia from testifying as [D]efendant seeks to do here with respect to Dr. Ufberg." [FN42] Thus, Plaintiff argues, "[t]he counterarguments of the [D]efendant would clearly go to the weight, not the admissibility of [Dr. Ufberg's] testimony, and the jury, as the trier of fact, would decide the ultimate issue." [FN43] With regard to Defendant's Rule 702 argument, Plaintiff maintains that Dr. Ufberg's testimony "would not be based upon mere speculation but rather would be the product of reliable princip[le] and method (*i.e.*, the marketplace for his services[,] as supported by the fact that most carriers with which he deals pay his charges in full without reduction) and he charged for his services no differently in this case than in any other." [FN44]

FN42. *Id.* ¶ 4 (emphasis in original removed).

FN43. *Id.* ¶ 3 (emphasis in original

removed).

FN44. *Id.* ¶ 3.

*THE SUMMARY JUDGMENT STANDARD*

Summary judgment is granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. [FN45] The Court must view the facts in a light most favorable to the non-moving party. [FN46] When the moving party makes this initial showing, the burden then shifts to the non-moving party to demonstrate that there are material issues of fact. [FN47]

FN45. Super. Ct. Civ. R. 56(c); *Burkhart v. Davies*, 602 A.2d 56 (Del.1991).

FN46. *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99-100 (Del.1992).

FN47. Super. Ct. Civ. R. 56(e); *Moore v. Sizemore*, 405 A.2d 679 (Del.1979).

*5 In resisting a motion for summary judgment, the non-movant's evidence of material facts in dispute "must be sufficient to withstand a motion for directed verdict [*i.e.*, motion for judgment as a matter of law] and support the verdict of a reasonable jury." [FN48] Consequently, if (as here) the summary judgment movant does not bear the burden of persuasion at trial, "the movant's burden to show presumptive entitlement to summary judgment is satisfied if the movant points to the absence of any factual support for an essential element of plaintiff's claim." [FN49]

FN48. 11 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 56.03[3], at 56-35 (3d ed.2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-252 (1986)); *see also Cerberus Int'l, Ltd. V. Apollo Mgmt., L.P.*, 794 A.2d

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 22290906 (Del.Super.)
(Cite as: 2003 WL 22290906 (Del.Super.))

1141, 1148-1149 (Del.2002) (en banc) (adopting *Liberty Lobby'* s "main holding" that the substantive standard of proof required at trial should also be the substantive standard of proof at the summary judgment stage).

FN49. MOORE ET AL., *supra* note 41, § 56.03[5], at 56-39 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-324 (1986)); *see also Burkhart*, 602 A.2d at 59 (stating that the *ratio decidendi* of *Celotex* is persuasive and directly applicable to circumstances where the non-movant has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof).

*APPLYING THAT STANDARD, DEFENDANT IS IN PART ENTITLED TO SUMMARY JUDGMENT*

The first issue to be discussed is Defendant's assertion that Plaintiff lacks standing to contest the reasonableness of Dr. Ufberg's fees and that "[t]he issue of whether a medical expense is reasonable is an issue properly left to resolution by the ... [insurer] and the [medical] provider." [FN50] As noted, Defendant provides no authority for this assertion. Given that fact (and mindful that the facts must be viewed in the light most favorable to Plaintiff at this summary judgment stage), the Court finds that Defendant has effectively abandoned this claim, and the Court cannot therefore evaluate it in any meaningful manner. [FN51]

FN50. Def.'s Mot. ¶ 9.

FN51. *See FleetBoston Fin. Corp. v. Advanta Corp.*, 2003 WL 240885, at *20 (Del. Ch. Jan. 22, 2003) (stating that a court "would be hard pressed to evaluate or respond to an argument that the proponent does not ... itself ... explain or elaborate[ ]").

With regard to Defendant's argument that it should be granted summary judgment because Plaintiff "has proffered no evidence that the amounts charged by ... [Dr. Ufberg] are reasonable[ ][,]" [FN52] Defendant correctly posits that this burden lies with Plaintiff herself. As a preeminent treatise on the subject has recognized, "[a] claimant for medical expense benefits [under a relevant no-fault statute] bears the burden of proof to establish by a preponderance of the evidence that the medical services received were necessary and that the bills or charges for such services were reasonable." [FN53]

FN52. *Id.* ¶ 10.

FN53. 17 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE § 254:59 (3d ed.2001).

With regard to Defendant's ultimate argument in its Motion for Partial Summary Judgment (as well as its argument relative to Dr. Ufberg contained within its Motion in Limine), this Court cannot now say that Defendant's claim of unreasonableness would result in a directed verdict in its favor, were this case to go to trial. [FN54] In reaching this conclusion, the Court finds that the *Anticaglia* case is useful. And for that reason, Defendant's Motion for Partial Summary Judgment on this point is denied.

FN54. *See* Super. Ct. Civ. R. 50 (stating that where there "is no legally sufficient evidentiary basis for a reasonable jury to find for ... [a] party on ... [an] issue, the Court may determine the issue against the party ...").

As stated, *Anticaglia* recognized that the determination of the "reasonableness" of a medical provider's bills is entirely factual in nature. Of note from that decision (which was tried to a judge as a non-jury appeal from compulsory arbitration) [FN55] is the Court's statement that although "there was no reliable proof by ... [the medical provider

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 22290906 (Del.Super.)
(Cite as: 2003 WL 22290906 (Del.Super.))

who had brought suit to recover unpaid bills] of the ordinary and reasonable charges made by members of [his] profession" and although "[h]e alone testified that ... [his charges] were reasonable[ ][,]" the judge trying the case could not "give it full weight under all of the circumstances [t]here[ ]" despite the admissibility of such evidence. [FN56] The judge did, however, set forth guidelines of the kind of proof that would be reliable in a given case, such proof including:

FN55. *Anticaglia,* 1992 WL 138983 at *1.

FN56. *Id.* at *7.

*6 the ordinary and reasonable charges usually made by members of the same profession of similar standing for services such as those rendered ..., the nature and difficulty of th[ose] [services], the time devoted to it, the amount of services rendered, the number of visits, the inconvenience and expense to which the physician was subjected, and the size of the city or town where the services were rendered. [FN57]

FN57. *Id.* at *6.

Nevertheless, the plaintiff-doctor in *Anticaglia* offered only his "general" testimony that his fees were "reasonable and customary," that the insurance company had "fully allowed" other fees he had charged the patient for whom the insurer subsequently failed to completely reimburse the doctor, and a letter to the insurer claiming that his fees were based on similar charges in "the Delaware Valley Area" when he in fact "did not offer any proof beyond his own ill-defined representations what he meant by this 'region." ' [FN58]

FN58. *Id.* at *5.

Applying those precepts here, this Court finds that Dr. Ufberg's testimony as to the "reasonableness" of his billings is in fact admissible at trial, and, as argued by Plaintiff, is for the trier of fact to evaluate. From Plaintiff's initial proffer of the

substance of Dr. Ufberg's anticipated testimony, this Court cannot now say that there exists "no reliable proof" upon which such "reasonableness" could potentially be proved at trial; instead, the jury will be instructed as to the Plaintiff's burden of proof by a preponderance of the evidence. Any claim that Dr. Ufberg's method of determining the "reasonableness" of his billings is not reliable is therefore part and parcel of the fact-finder's determination, and this Court will not now exclude Dr. Ufberg from testifying on that alternative ground. Accordingly, Defendant's Motion for Partial Summary Judgment is denied as to this issue, as is its Motion in Limine on the same.

Summary judgment in Defendant's favor on Plaintiff's "bad faith" allegation, however, is warranted. As stated, *Casson* requires that, in order to maintain a viable "bad faith" cause of action, a plaintiff "must show that the insurer's refusal to honor its contractual obligation was clearly without any reasonable justification." [FN59] In other words, the *Casson* Court held, "at the time the insurer denied liability, there [cannot have] existed a set of facts or circumstances known to the insurer which created a bona fide dispute and therefore a meritorious defense to the insurer's liability." [FN60] As one treatise on the subject has stated, "[i]n drafting the complaint, it will be necessary for the plaintiff to allege facts showing that the defendant engaged in tortious conduct that was sufficiently aggravated in character...." [FN61]

FN59. *Casson,* 455 A.2d at 369.

FN60. *Id.*

FN61. Roderick J. Mortimer, *Cause of Action to Obtain Punitive Damages in Action Against Insurer for Refusal to Settle or Pay Claim,* in 13 CAUSES OF ACTION 729, at 810 (1987); *but cf . Tackett v. State Farm Fire and Cas. Ins. Co.,* 653 A.2d 254, 264 (Del.1995) (stating that "claims by insureds concerning coverage disputes are subject to a contractual analysis[ ]").

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d
2003 WL 22290906 (Del.Super.)
(Cite as: 2003 WL 22290906 (Del.Super.))

Page 9

Applying those standards here, the Court finds that this portion of Plaintiff's action potentially would not withstand a motion for directed verdict were this case to proceed to trial. In other words, Plaintiff has failed at this juncture to show there existed no "set of facts or circumstances known to the insurer which created a bona fide dispute and therefore a meritorious defense to the insurer's liability[ ][,]" [FN62] i.e., the trier of fact may determine that Dr. Ufberg's bills were completely "unreasonable." As stated, Plaintiff has taken no discovery in support of its "bad faith" claim; the burden, however, rests on Plaintiff to show that "although she has complied with all policy requirements," Defendant has not paid "under the policy." [FN63] Plaintiff has therefore made nothing more than "[a]n assertion of malice without factual basis...." [FN64] For that reason, Defendant's Motion for Partial Summary Judgment on this point is granted.

FN62. Casson, 455 A.2d at 369.

FN63. DEL. P.J.I. CIV. § 17.10 (2000); see also Tackett v. State Farm Fire & Cas. Ins. Co., 653 A.2d 254, 264 (1995) (stating that the presence of bad faith "is actionable where the insured can show that the insurer's denial of benefits was 'clearly without any reasonable justification[ ]' ") (citing Casson, supra ).

FN64. Id. at 368.

*7 Lastly, Defendant's argument that summary judgment in its favor barring any recovery of attorneys' fees by Plaintiff must also be granted. As the Casson Court noted, "[a]part from authorization in statute or contract, equity is the only basis for awarding attorney's fees to a successful party...." [FN65] Defendant has stated that there is no relevant provision in the policy at issue here that speaks to an award of attorneys' fees (an argument Plaintiff did not rebut), and the Casson Court indicated that "there is no statutory basis for an award of attorney's fees in th[e] [no-fault] case [arena]." [FN66] Accordingly, Defendant's Motion for Partial Summary Judgment on this issue is

granted as well.

FN65. Id. at 370.

FN66. Id.

CONCLUSION

For all of the above reasons, Defendant's Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART. [FN67] With respect to Defendant's Motion in Limine, that motion is DENIED IN PART and DEFERRED IN PART.

FN67. Given the Court's disposition, it is not necessary that the Court consider the ultimate question posed by Defendant, i.e., whether a medical expense is reasonable "is an issue properly left to resolution by the ... [insurer] and the [medical] provider." Def.'s Mot. ¶ 9. Thus it is unnecessary for the Court to construe the language of Delaware Department of Insurance Auto Bulletin No. 10 (written in response to "a number of automobile insurers ... refusing to pay ... [no-fault] benefits in the amount charged by health care providers as a result of a determination that the amount charged is not 'reasonable' "), attached as Exhibit "E" to Defendant's motion.

IT IS SO ORDERED.

2003 WL 22290906 (Del.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

# E X H I B I T   J

IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

MELISSA MURPHY, et al.,              )
                                     )
            Plaintiffs,              )
                                     )
      v.                             )        C.A. No. 04C-07-003 RFS
                                     )
UNITED SERVICES AUTO ASSN., et al.,  )
                                     )
            Defendants               )

                    Date Argued:      April 28, 2005
                    Date Decided:     May 10, 2005

## **ORDER**

Upon careful review of the filings in the above captioned matter, Defendants' Motion to

Dismiss for Lacking of Standing is granted, and Certain Defendants' motion to Dismiss is

granted as to the Class Claims. It appears to the Court that:

Plaintiffs Melissa Murphy ("Murphy") and Peter Galley ("Galley") have brought suit for

themselves and as representatives of a class of persons who have purchased no-fault auto

insurance pursuant to 21 *Del. C.* § 2118. They are suing Progressive Northern Insurance

Company ("PNIC") and GEICO Indemnity Insurance Company ("GEICO"), their providers,

respectively, and fifteen other insurance companies who provide no-fault insurance in Delaware,

as a defendant class.[1] Plaintiffs allege that the Defendants are engaged in an industry-wide

practice that unfairly denies full payment for medical expenses.[2]

They are seeking monetary damages in the amount of $1,606.00 for Murphy and

$1,633.60 for Galley. In addition, they seek monetary damages for the amounts each class

1

plaintiff has had to pay for medical expenses as a result of this practice, and they seek punitive damages.[3] The Plaintiffs also have requested a declaratory judgment that the practice violates the public policy of Delaware and undermines the intent of the No Fault Law. Specifically, they ask for "an order declaring denials based on the insurers' medical reports, unauthorized and illegal, an order declaring the practice of unilateral reductions in medical expense payments unauthorized and illegal . . ." Pl.'s Compl. at 6. A motion for Class Certification has not yet been made.

The Defendants (other than GEICO and PNIC) have filed a motion to dismiss under Rule 12(b)(6), claiming the representative Plaintiffs lack standing to bring suit against them. PNIC has adopted the reasoning of and joined in a limited capacity the Defendants Motion to Dismiss for Lack of Standing. It claims that Galley and other non-PNIC policy holders have no standing to sue it, for the same reasons they have no standing to sue the other insurance companies.

GEICO and PNIC have also filed a Rule 12(b)(6) motion to dismiss, alleging that the Plaintiffs have failed to sufficiently plead the Superior Court Civil Rule 23 class action criteria, and for failure to state a claim upon which relief can be granted. They have been joined in this motion by the other fifteen defendants. More specifically, GEICO and PNIC claim that Plaintiffs 1) have failed to adequately define their class; 2) have not shown how common questions of law or fact predominate over individual questions; 3) have failed to allege how the representative Plaintiffs, Murphy's and Galley's, claims are typical of those of the class members; 4) have not proved that the representative Plaintiffs are adequate to represent the interests of the class members; and, 5) did not allege in their complaint that handling the case as a class action is superior to other means of resolving these disputes. Moreover, these two Defendants argue that even if Plaintiffs had pleaded those Rule 23 requirements, they would not, as a matter of law, be

2

able to meet them. In addition, GEICO and PNIC allege that the Plaintiffs cannot maintain a class action because the relief they seek is primarily monetary. They also claim that the Complaint is not clear enough under Superior Court Rule 8 to give Defendants notice of the nature of the claim (and, in a footnote, that it is prolix, in violation of Rule 8's mandate that a Complaint be "simple, concise and direct")

## DISCUSSION

The Plaintiffs, Murphy and Galley do not have standing to sue the Insurance Company Defendants from which they have not purchased no-fault insurance. The Delaware Supreme Court has stated that the law in Delaware is based upon the Supreme Court's interpretation in *Lujan v Defenders of Wildlife*, 504 U.S. 555 (1992), as it was summarized by the Third Circuit:

> (1) the plaintiff must have suffered an injury in fact--an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) there must be a causal connection between the injury and the conduct complained of--the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court; and (3) it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision

*Dover Historical Soc'y*, 838 A.2d at 1110, *citing, Soc'y Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 175-76 (2000).

A plaintiff must establish injury to himself by the parties he wishes to sue. *See Weiner v. Bank of King of Prussia*, 358 F.Supp. 684, 690 (E.D. Pa. 1973) ("It is a fundamental principle of law that a plaintiff must demonstrate injury to himself by the parties whom he sues before that plaintiff can successfully state a cause of action."). Here, the Plaintiffs have failed to demonstrate they were injured by any of the fifteen insurance companies they are attempting to sue as a class. "A plaintiff may not use the procedural device of a class action to boot strap

3

himself into standing he lacks under the express terms of the substantive law." *Id.* at 694.[4]

Because Plaintiffs Murphy and Galley suffered no injury at the hands of the fifteen Defendants

other than PNIC and GEICO, those Defendants are dismissed from this case for lack of standing.

Even if the Court were to find standing, it would still dismiss this class action. The

Plaintiffs are seeking a hundred percent return on all of their applicable expenses, stating: "Once

an insurer has accepted responsibility for injuries arising from an accident, prompt payment

should be made until such time as there is an adjudication adverse to the insured . . . ." Pl.'s

Compl. ¶ 36  They claim:

> The medical bills and 'no work' directions of the health care providers for the
> Class, are *prima facie* evidence of reasonableness and necessity. The IMEs and
> cost reduction opinions merely dispute the reasonableness and necessity of the
> treatment and opinions of the health care providers and the burden of proof should
> be on the insurers under the stated public policy for No Fault, prompt payment
> without the necessity for suit.

Pl.'s Compl. ¶ 35

The Plaintiffs have failed to state a cause of action upon which relief can be granted. As

a matter of law, the burden lies on the Plaintiff, not on the insurer, to show the expenses were

"reasonable and necessary." 21 *Del. C.* § 2118 (a) requires that every owner of a motor vehicle

have personal injury insurance providing coverage "for reasonable and necessary expenses

incurred within 2 years from the date of the accident."[5] The words "reasonable and necessary"

qualify the scope of the delineated benefits that an insurance company must pay. In fact, section

2118 has been interpreted as "fix[ing] a statutory minimum rather than a maximum standard of

protection." *Casson v Nationwide Ins. Co.*, 455 A.2d 361, 366 (Del. Super. Ct. 1982) (finding

that, regarding lost earnings, "reasonable" referred to the amount, while "necessary" meant

"those lost earnings which were 'unavoidable' or inescapable'"). Delaware has consistently permitted insurers to investigate the reasonableness of expenses.[6]

Furthermore, in *Ramsey v. State Farm Mut. Ins. Co.*, 869 A.2d 327 (Table), 2005 WL 528846, at * 1 (Del.) the Supreme Court, in adopting the reasoning of *Casson*, 455 A.2d 361, stated, "[t]he PIP statute provides recovery only for 'reasonable and necessary' expenses. In order to satisfy that requirement, Ramsey had to establish that her lost wages were unavoidable. Since she offered no evidence on that point, she failed to establish her entitlement to PIP benefits." This ruling directly contradicts the claims of the Plaintiffs that the burden of proof should be on the insurers, and that section 2118 and public policy require full payment of benefits until an adverse judgment is obtained.[7]

In sum, the causes of action brought by Murphy and Galley on behalf of a class of plaintiffs and against the fifteen Defendants and against PNIC and GEICO must be dismissed. The individual claims of Murphy and Galley against PNIC and GEICO survive dismissal, however, because they may have a contract claim against their respective insurance companies. In this regard, their claims must be severed as each only has standing against the company which issued his or her no fault insurance policy. In addition, in response to the Defendants' Motion to Dismiss for the reason that the Complaint is not sufficiently clear under Superior Court Civil Rule 8, pursuant to Superior Court Civil Rule 12(e), the Plaintiffs are required to provide a more definite statement of their respective claims against PNIC and GEICO within thirty days.

Because the class action claims have been dismissed for lack of standing and for failure to state a claim upon which relief can be granted under Rule 12(b)(6), the Court need not address the Defendants' other contentions regarding the Superior Court Civil Rule 23 class certification requirements.

5

## CONCLUSION

Considering the foregoing, Defendants' Motion to Dismiss for Lack of Standing is granted. Plaintiffs Murphy' and Galley's claims are dismissed against the Defendants United Services Auto Association, State Farm Mutual Automobile Insurance Company, The Peninsula Insurance Company, Allstate Ins. Co., Hartford Underwriters Ins Co., Nationwide Mut. Ins. Co., Nationwide Assurance, Keystone Ins. Co.; Encompass Ins., Pawtucket Mut. Ins. Co., Liberty Mut. Ins. Co., Westfield Ins. Co., Montgomery Mut. Ins Co., Harleysville Mut. Ins. Co., and The Travelers Indemnity Co. The Class allegations of Plaintiffs Murphy and Galley are also dismissed against GEICO and PNIC. All that remains is each Plaintiff's claim against the individual's carrier. The Plaintiffs have thirty days to provide a more definite statement of those claims

*IT IS SO ORDERED.*

Dated: _May 10, 2005_                          _Richard F. Stokes, Judge_

oc:     Prothonotary
cc:     H. Clay Davis, III, Esquire
        Sherry R. Fallon, Esquire
        Dawn L. Becker, Esquire
        Gary W. Aber, Esquire
        John D Balaguer, Esquire

## ENDNOTES

1. The other insurance companies are United Services Auto Association, State Farm Mutual Automobile Insurance Company, The Peninsula Insurance Company, Allstate Ins. Co., Hartford Underwriters Ins. Co., Nationwide Mut. Ins. Co., Nationwide Assurance, Keystone Ins. Co., Encompass Ins., Pawtucket Mut. Ins. Co., Liberty Mut. Ins. Co., Westfield Ins. Co., Montgomery Mut. Ins. Co., Harleysville Mut. Ins. Co., The Travelers Indemnity Co.

2.       [P]laintiffs ... allege that Defendants have unlawfully denied payment of some or all of their benefits, relying on medical opinions Defendants have procured or because of self-serving reviews based on criteria orchestrated by the Defendants, or on evaluations by an untrained insurance adjuster's unsubstantiated opinion of coverage, necessity and/or reasonableness of costs. They also allege that many such determinations are made before there is sufficient treatment to make a fair assessment. They allege an industry wide practice of unfair denials or partial payments.

Pl.'s Compl. at 1.

3.       This is an action seeking recovery of amounts the Plaintiff and the Class have paid for health care expenses or have lost earnings because they were injured in auto accidents and their contractual and statutory benefits were denied based on [the practice in n.2] ....
      1. The amounts to be recovered are the sums paid by all who were forced to meet the expenses or losses which should have been met or paid by the Defendants.

Pl.'s Compl. at 1.

4.       There are no Delaware class action cases which specifically address the issue of a plaintiff's standing to sue a defendant class or a group of defendants. Sections (a) and (b) of Superior Court Civil Rule 23 are identical to the Federal Rule. The Court has reviewed extensively the Federal law regarding standing and discovered that there is a difference of opinion as to how the issue should be addressed. See, e.g., *State ex rel. Erie Fire Ins. Co. v. Madden*, 515 S.E.2d 351, 355 n.6 (W. Va. Supr. 1998) for a discussion of the Federal Courts'

views. The question is whether a Court should address the class certification requirements under Federal Rule of Civil Procedure 23 before considering standing or vice versa. If a class is certifiable, then the question becomes whether standing should be addressed to the plaintiff or defendant class as a whole, or examined from each plaintiff to each defendant. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 830-31 (1999); *Amchem Prods., Inc.*, 521 U.S. 591, 612-13 (1997); *Rivera v. Wyeth-Ayerst Labs*, 283 F.3d 315, 319 (5th Cir. 2002); *Payton v. County of Kane*, 308 F.3d 673, 678-82 (7th Cir. 2002) *cert. denied sub nom. Carroll County, Ill. v. Payton*, 540 U.S. 812 (2003), *Fallick v Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998); *La Mar v. H & B Novelty & Loan Co.*, 489 F.2d 461 (9th Cir. 1973); *In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162 (D. Mass. 2004); *Weiner v. Bank of King of Prussia*, 358 F.Supp. 684 (E.D. Pa. 1973).

Standing is an issue of state subject matter jurisdiction, however, and under Delaware law, it is not subject to the same Constitutional limitations inherent in a Federal Court's Article III standing analysis. *See Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1111 (Del. 2003) ("Unlike the federal courts, where standing may be subject to stated constitutional limits, state courts apply the concept of standing as a matter of self-restraint to avoid the rendering of advisory opinions at the behest of parties who are 'mere intermeddlers.'"); *Cedar Crest Funeral Home, Inc., v. Lashley*, 889 S.W.2d 325 (Tx. Ct. App. 1993) (declining to follow the reasoning applied to class standing in *Weiner*, 358 F. Supp. 684, because it conflicted with the procedural requirements for subject matter jurisdiction under Texas law).

Other Delaware Courts have interpreted Chancery Rule 23, which is essentially the same as Superior Court Civil Rule 23, as being procedural in nature, and not jurisdictional. *See Wilmington Trust Co v. Schneider*, 320 A.2d 709, 710-11 (Del. 1974) (stating that Chancery

8

Rule 23 is procedural and not jurisdictional such that it could not confer jurisdiction upon an

equity court for a case which should have been brought in a law court); *Delaware Bankers Ass'n*

*v. Div. of Revenue of the Dep't of Finance*, 298 A.2d 352, 357 (Del. Ch. 1972) (finding Chancery

Rule 23 could not be "'construed to extend or limit the jurisdiction of the Court of Chancery.'"

(citation omitted)). It follows that Superior Court Civil Rule 23 is also procedural in nature, and

made not be used to expand the Court's jurisdiction through the creation of a class of defendants

or plaintiffs, if standing does not otherwise exist. Furthermore, Superior Court Civil Rule 82

states: "These Rules shall not be construed to extend or limit the jurisdiction of the Superior

Court or to affect the venue of actions therein." *Cf. Delaware Bankers Ass'n*, 298 A.2d at 357

(citing Chancery Court Rule 82 in support of the Court's decision that Chancery Rule 23 could

not extend the Court's jurisdiction). In sum, despite the nuances at the federal level, this Court

will address standing before issues of class certification.


5. 21 *Del. C.* § 2118(a)(2)a. specifically provides:

    (a) No owner of a motor vehicle required to be registered in this State, other than
a self-insurer pursuant to § 2904 of this title, shall operate or authorize any other
person to operate such vehicle unless the owner has insurance on such motor
vehicle providing the following minimum insurance coverage:

    (2)a. Compensation to injured persons for reasonable and necessary expenses
incurred within 2 years from the date of the accident for:

        1. Medical, hospital, dental, surgical, medicine, x-ray, ambulance,
prosthetic services, professional nursing and funeral services.
Compensation for funeral services, including all customary charges
and the cost of a burial plot for 1 person, shall not exceed the sum
of $5,000. Compensation may include expenses for any
nonmedical remedial care and treatment rendered in accordance
with a recognized religious method of healing.

        2. Net amount of lost earnings. Lost earnings shall include net lost
earnings of a self-employed person.

9

3. Where a qualified medical practitioner shall, within 2 years from the date of an accident, verify in writing that surgical or dental procedures will be necessary and are then medically ascertainable but impractical or impossible to perform during that 2-year period, the cost of such dental or surgical procedures, including expenses for related medical treatment, and the net amount of lost earnings lost in connection with such dental or surgical procedures shall be payable. Such lost earnings shall be limited to the period of time that is reasonably necessary to recover from such surgical or dental procedures but not to exceed 90 days. The payment of these costs shall be either at the time they are ascertained or at the time they are actually incurred, at the insurer's option.

4. Extra expenses for personal services which would have been performed by the injured person had they not been injured.

5. "Injured person" for the purposes of this section shall include the personal representative of an estate; provided, however, that if a death occurs, the "net amount of lost earnings" shall include only that sum attributable to the period prior to the death of the person so injured.

6. In fact, an insured who wants to challenge an insurer's denial of benefits because of the insurer's belief that they were not reasonable and necessary must bring a claim of bad faith denial of benefits against the insurer. *See Albanese v. Allstate Ins. Co*, 1998 WL 437370 (Del. Super. Ct.); *Watson v. Metro. Prop. & Cas. Ins. Co.*, 2003 WL 22290906 (Del. Super. Ct.) (bringing claims of bad faith to challenge denials of benefits that the insurers found not to be reasonable and necessary). In order to establish bad faith, a plaintiff "must show that the insurer's refusal to honor [the claim] was clearly without any reasonable justification." *Albanese*, 1998 WL 437370, at *2

7. With appropriate candor, Plaintiffs' Counsel acknowledged the vulnerability of his position should an insured have the burden to show reasonable and necessary expenses. He brought the *Ramsey* case to the Court's attention at oral argument. Mr. Davis is a well-respected member of

10

the Bar and has once again acted in a professionally exemplary manner.